STATE OF NORTH CAROLINA v. ROBERT LEE THOMPSON AND WILLIE DAVIS McEACHERN

No. 45

(Filed 14 July 1976)

1. **Criminal Law §§ 34, 66— evidence showing defendant's commission of another crime — competency on question of identity**

In this prosecution for rape, testimony identifying defendant as one of two men who attacked and attempted to rape another woman some thirty minutes before the prosecutrix was abducted was competent and admissible to establish that he was also one of the men who raped the prosecutrix where the two attacks were similar in the following respects: (1) In both, the victims were approached as they sat parked in the same secluded lover's lane; (2) in both, the attackers were two black men—one medium in height and the other much shorter; (3) in both, the larger man had a nylon stocking pulled over the upper part of his face; (4) in both, all the victims were ordered from the cars and the men ordered to sit on the ground; (5) a sawed-off shotgun was used in both attacks; (6) the primary motive for both attacks was rape of the female victims; and (7) in both instances the perpetrators drove a car with unusually loud mufflers.

2. **Constitutional Law § 36; Rape § 7— invalidity of death penalty for rape — substitution of life imprisonment**

Since the decision of *Woodson v. North Carolina*, ... U.S. ....., invalidating the death penalty provision of G.S. 14-17, by implication also invalidated the death provisions of G.S. 14-21(a)(2), the statute under which defendant was convicted and sentenced to death for rape, the sentence of death imposed upon defendant must be vacated and a sentence of life imprisonment substituted in lieu thereof under the authority of N. C. Sess. Laws, c. 1201, § 7 (1973).

3. **Rape § 1— use of deadly weapon to procure submission**

A deadly weapon is used to procure the subjugation or submission of a rape victim within the meaning of G.S. 14-21(a)(2) when (1) it is exhibited to her and the defendant verbally, by brandishment or otherwise, threatens to use it; (2) the victim knows, or reasonably believes, that the weapon remains in the possession of her attacker or readily accessible to him; and (3) she submits or terminates her resistence because of her fear that if she does not he will kill or injure her with the weapon.

4. **Rape § 5— first degree rape — sufficiency of evidence**

The State's evidence in a rape case was sufficient to permit the inference that defendant procured the victim's submission through the use of a deadly weapon and was sufficient to overcome defendant's motion for nonsuit of the charge of first degree rape where it tended to show: defendant participated in the abduction of the victim at gunpoint from a lover's lane and then drove to a secluded house he had rented while his codefendant threatened the victim with the gun; at the house the codefendant raped the victim in the automobile while

holding the gun in his hand; defendant told the victim to come with him and the codefendant, while still holding the gun, ordered her to do so; as defendant led the victim inside the house he told her if she did what he wanted her to do he would not let "the other guy" kill her; inside the house defendant continually cautioned her "to do just like he told her to do and [she] would not be killed"; the victim complied out of fear for her life; and the codefendant again raped the victim at gunpoint while defendant drove them back to town. Furthermore, the evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of first degree rape on the theory that he aided and abetted the codefendant in his two rapes of the victim.

**5. Criminal Law §§ 83, 102— failure of defendant's wife to testify — improper jury argument —— duty of court to intervene**

The district attorney violated G.S. 8-57 by arguing to the jury that "I can't use a man's wife against him, but he can use his wife for himself. Wouldn't she be a good person to tell you when he came in and how he got in the house? Have you heard from her?" and, notwithstanding the failure of defendant's counsel to object to such argument, it was incumbent upon the trial judge, on his own initiative, to intervene and instruct the jury to disregard the district attorney's argument.

APPEAL by defendants pursuant to G.S. § 7A-27(a) from *Godwin, J.,* 9 June 1975 Session of ROBESON Superior Court.

Defendants were charged, in separate bills of indictment, with the first degree rape of Naomi Hardin on 8 February 1975. The two cases were consolidated for trial and, in separate verdicts, the jury found defendants guilty as charged. From the court's sentence imposing the death penalty, defendants appealed directly to this Court.

The State's evidence tended to show the facts summarized below.

On Saturday, 8 February 1975 at approximately 12:45 a.m., Jack Hardin and his wife, Naomi Hardin, who had been separated for a year, were sitting in his car in a wooded area close to the Lumber River, where they had gone to discuss their marital problems. They had been parked for five or ten minutes when the front doors of their car were suddenly opened by two black males. (At the trial Mrs. Hardin identified both men; Mr. Hardin was not able to identify or describe either except as to their general height and build.) The man on Mrs. Hardin's side of the car, whom she identified as defendant McEachern, was carrying a sawed-off shotgun; a nylon stocking masked the upper half of his face. The shorter of the two men, whom Mrs.

Hardin identified as defendant Thompson, was on Mr. Hardin's side of the car. A nylon stocking covered his entire head.

One of the men demanded that Mr. and Mrs. Hardin get out of the car. When Mrs. Hardin began to scream, McEachern put the shotgun into her side and told her to be quiet or he would kill her. When she continued to scream, McEachern pulled her from the car and slapped her several times, threatening her as he did so. Meanwhile defendant Thompson had escorted Mr. Hardin to Mrs. Hardin's side of the car.

When he had stopped her screaming McEachern directed Thompson to take Mrs. Hardin further into the woods and told Mr. Hardin to go to the rear of the car and to sit on the ground. Mr. Hardin did as he was told but, as he was squatting down, he grabbed some dirt, threw it into McEachern's face, and ran. McEachern caught him, knocked him to the ground, and rendered him unconscious by a blow from the gun. When Mr. Hardin regained consciousness Mrs. Hardin and the two men were gone.

According to Mrs. Hardin's testimony, as Thompson was leading her away from the car, she broke free and ran, but she had gone only a short distance when McEachern grabbed her. He put the shotgun into her side and said, "Come on, bitch, you going with us." At that point both McEachern and Thompson grabbed her by the arms and dragged her through the underbrush until they arrived at a light colored 1966 Plymouth Fury automobile. McEachern pushed her into the front seat and put a stocking "mask" over her head. The mask was thin and she could see through it. McEachern then got into the car on the passenger's side with the gun still in his hand. Thompson got into the driver's seat, removed his stocking mask and put it over Mrs. Hardin's head. He started the car and the three drove away from the wooded area, locally known as Lover's Lane. Mrs. Hardin noticed that the red oil or alternator light of the car blinked on and off as the motor ran. She also noticed that the car had a black interior, loud mufflers, and a three-speed, standard gear shift transmission.

Soon after driving away Thompson said, "I know a place where we can go." Mrs. Hardin continuously begged them to let her go, and McEachern kept telling her to be quiet or he would kill her. He still had the gun in his hands. McEachern soon began to fondle her breasts and directed her to remove the

pants suit she was wearing. She refused and in a short while the car pulled onto a rural road, drove up to a small house and stopped. Mrs. Hardin observed a mercury vapor night light located in the yard close to the house.

When the car stopped, Thompson got out. McEachern put the muzzle of the gun to Mrs. Hardin's head and again demanded that she remove her pants. Because of the gun Mrs. Hardin complied and McEachern had intercourse with her on the front seat of the car. All the while he kept the gun in his hand with the muzzle touching Mrs. Hardin's head. The car's interior dome light was on and she could see McEachern clearly.

While McEachern was still having intercourse with her, Thompson knocked on the car window. When he did so, McEachern directed Mrs. Hardin to go with Thompson. He remained at the car while Thompson then took her by the arm and led her inside the house to a bedroom. The mercury vapor light shone through the curtainless window of the bedroom, and Mrs. Hardin could see Thompson's face clearly. After Thompson told her to do as he directed or he would let McEachern kill her, he instructed her to sit on the bed and to remove her pants. At this time McEachern was apparently still outside at the car. Out of fear of McEachern and Thompson, Mrs. Hardin complied with Thompson's demands. Thompson then had intercourse with her. Afterwards he returned her to the car. While inside the house, however, Mrs. Hardin was able to lift the nylon stockings that were on her head and to adjust them so that she could see clearly.

At the car, Mrs. Hardin again tried to escape. McEachern grabbed her and said, "If you take another step I will blow your head off." Thompson then got into the driver's seat. At this point McEachern pushed Mrs. Hardin into the back seat of the car and got in with her, laying the shotgun in the front seat as he did so. He then demanded that she remove her pants again. When she protested he reached into the front seat, got the gun, and put the muzzle to her head. At this point the car drove away, headed toward Lumberton. Again, because the gun was at her head. Mrs. Hardin complied with McEachern's demands and he had intercourse with her a second time. As he was doing so, Thompson called out, "My God, man leave her alone, we are coming into town." McEachern then desisted. The gun was still in his hand.

Thompson drove to a wooded area and stopped. McEachern told Mrs. Hardin to get out and threatened to kill her if she ever told what had happened. He removed the stockings from her head while her back was toward him and threatened to blow her head off if she looked back. Mrs. Hardin ran from the car and, as she fled, she heard the car's loud mufflers as it pulled away.

Mrs. Hardin, who was a life insurance agent, selling debt insurance for the Coastal Plains Life Insurance Company, was familiar with the area where defendants left her, for it was in her sales territory. She ran to the house of Joe Pittman, an elderly black man to whom she had sold insurance. It was about 2:00 or 2:30 a.m. when she arrived at his house. She had great difficulty in wakening him and, when she did so, he was very frightened. He finally let her inside and she explained what had happened. He refused to take her to town because he had only a limited driving permit, and he was afraid the two men would be lying in wait for them. However, at 6:30 a.m. he took her to town and deposited her several blocks from her home. As she was running to her house Mrs. Hardin met her husband and brother. Along with law enforcement officers they had spent the night looking for her in the Lover's Lane area. Upon seeing them Mrs. Hardin became hysterical, and they took her home where she explained to them what had occurred. When the police arrived later she recounted to them the events of the past evening.

Subsequently she went with the police over the route defendants had taken from Lover's Lane to the house where they had raped her and from there to the spot where they let her out. On the following Tuesday evening she went to the police station to view a line-up. Upon arriving she saw the car which had been used in the attack upon her. In a line-up of nine black males of various complexions and sizes she identified both defendants. In addition to the testimony of Detective Sanderson, one of the investigating officers, as to Mrs. Hardin's statements to him, all of which corroborated her testimony, the State offered evidence tending to show that defendant Thompson was the owner of the car which had been used in the crime, and that in January 1975 he had rented the house to which Mrs. Hardin was taken from Jimmy Floyd. Mr. Floyd testified that Thompson was living in the house on 8 February 1975.

The State also adduced the testimony of Peggy Grainger and Danny Walters who had parked in the Lover's Lane about

11:00 p.m. on 7 February 1975. In substance, Grainger and Walters testified that defendant McEachern and a smaller accomplice, whom they could not identify, approached their car around 12:15 a.m. on 8 February. McEachern, who had a shotgun, ordered the two out of their car and he attempted to rape Miss Grainger. Grainger and Walters were able to ward off the attack, however. (Their testimony will be examined in greater detail in the opinion.)·

Both defendants presented alibi defenses. In substance defendant Thompson's story was as follows: On the night of 7 February 1975 he left his girl friend's home at 11:30 p.m. He rode around until about 12:10 a.m., when he stopped to help McEachern clear his car from a brick wall with which he collided while backing out of someone's driveway. After they freed the vehicle, he followed McEachern to his brother's house where they left his car. From there Thompson drove the two to Mauney's Supermarket where he saw several girls he knew. About 12:20 a.m. Thompson got out of the car to talk with the girls. At that point McEachern gave Thompson $10.00 for the use of his car for a couple of hours. McEachern left in Thompson's car and Thompson stayed in the supermarket parking lot talking with the girls. When McEachern returned at about 1:45 a.m., Thompson took him home and then took the girls to a local night club. After leaving the girls, Thompson went to the home he shared with his wife, arriving there at about 2:00 or 2:15 a.m. Thompson's alibi was corroborated by the testimony of his girl friend, who stated that he left her house at 11:30 p.m., and by the testimony of two of the girls with whom Thompson said he talked at the supermarket while McEachern was using his car. These girls testified that they saw McEachern give Thompson $10.00 and then drive away in Thompson's car.

Defendant McEachern's alibi was as follows: On the night of 7 February he got his car stuck on a block wall while backing out a driveway. Thompson came by, helped him push the car off the wall and left. McEachern then went to his brother's house, where he sat outside by himself drinking whiskey. He does not know what time it was or how long he sat there because he does not have a watch. In any event, he went over to the home of Mrs. Eva Mae McKinnon and fell asleep while visiting there. He does not know how long he was there, but Mrs. McKinnon woke him up and told him to leave. As he was returning to his brother's house he encountered Keal Gay, an old

---

State v. Thompson

---

family friend. The two of them sat around outside his brother's house drinking and finally McEachern went inside and went to bed. Mrs. McKinnon testified that McEachern came to her house at about 10:00 or 10:30 p.m. on 7 February. He had been drinking and he fell asleep. She woke him up when she was ready to go to bed and McEachern left her house at 11:30 p.m. Keal Gay testified that he met McEachern on the street outside his brother's house at 11:50 p.m. The two sat around drinking together until 12:55 a.m. when he told McEachern he had better go home.

At the close of all the evidence defendants' motions for nonsuit were overruled, and the judge instructed the jurors who thereafter returned the verdicts from which defendants appealed.

*Rufus L. Edmisten, Attorney General, William H. Boone, Associate Attorney, Myron C. Banks, Special Deputy Attorney General, for the State.*

*Everett L. Henry for defendant Thompson.*

*J. H. Barringer, Jr., for defendant McEachern.*

SHARP, Chief Justice.

## McEACHERN'S APPEAL

[1] On his appeal defendant McEachern brings forward four assignments of error, upon which he makes three contentions. The first (based upon assignments Nos. 5 and 9) is that the trial judge erred in admitting the testimony of Danny J. Walters and Peggy Grainger, which tended to show that McEachern was guilty of another and independent criminal offense.

As pointed out in the preliminary statement of facts, witnesses Walters and Grainger testified over defendant's objection, that on the night of 7 February 1975 they were "parking" in the Lover's Lane area where the abduction of Mrs. Hardin occurred. At approximately 12:15 a.m. (which was approximately one half hour before the attack on Mrs. Hardin) a man, whom they identified as defendant McEachern, came up to their car and pointed a sawed-off shotgun into the open car window. The man had a nylon stocking pulled over the upper half of his head. He was accompanied by a smaller man, whom neither Walters nor Grainger could identify. Defendant Mc-

Eachern ordered the two out of the car and asked if they had any money. He then directed Walters to "squat down" and told his accomplice to shoot him if he moved. Defendant then grabbed Miss Grainger and shoved her into the front seat of the car where he attempted to rape her. When Walters jumped up and rushed to the car in an effort to stop him McEachern struck him in the face with his fist. While McEachern was thus distracted, Miss Grainger managed to start her car and drive away. After she escaped, the two men took Walters' wallet and left. Walters heard them leave in a car which had very loud mufflers and which sounded as if it had a three-speed standard transmission. The car first proceeded in a direction away from the Lover's Lane, but immediately turned around and headed back in the direction from which it had started. Thereafter, neither Grainger nor Walters saw McEachern again until they both identified him in a line-up at the police station on the following Tuesday evening.

Defendant contends that introduction of this evidence violated the principle enunciated in *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954) that generally "in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense." *Id.* at 173, 81 S.E. 2d at 365. Defendant concedes that there are well-recognized exceptions to this general rule but contends that none of them are applicable to the present case. With this contention we cannot agree.

The opinion in *McClain* enumerates eight exceptions to the general rule. Exception No. 4 reads as follows: "Where the accused is not definitely identified as the perpetrator of the crime charged and the circumstances tend to show that the crime charged and another offense were committed by the same person, evidence that the accused committed the other offense is admissible to identify him as the perpetrator of the crime charged." *Id.* at 175, 81 S.E. 2d at 367. This exception has been applied in the following cases: *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884 (1974) ; *State v. McClain,* 282 N.C. 357, 193 S.E. 2d 108 (1972) ; *State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839 (1969) ; *State v. Biggs,* 224 N.C. 722, 32 S.E. 2d 352 (1944). *See also* 1 Stansbury's N. C. Evidence §§ 91-92 (Brandis rev. 1973) ; 29 Am. Jur. 2d *Evidence* §§ 320-22 (1967). Examination of several of them shows that the fourth exception is broad enough to cover the case presently before us.

---

**State v. Thompson**

---

In *State v. Tuggle, supra,* the defendant was charged with the armed robbery of one Smith and with the armed robbery and kidnapping of one Kiser. The evidence showed that at approximately 7:15 p.m. on 20 November 1972 Smith and Kiser were in a general merchandising store of which Kiser was the manager. An unmasked man came in with a shotgun and robbed Smith and the store's cash register. To make his escape, the man forced Kiser to drive him in Kiser's car to an area some distance from the store. At trial both Kiser and Smith, in addition to Kiser's daughter who had seen the man abduct her father, identified the defendant as the perpetrator of the crime. Over the defendant's objection the State introduced the testimony of a Mrs. Hicks, the manager of a convenience store situated within close proximity of the Kiser store. She testified that at 6:45 p.m. on 20 November 1972, an unmasked man, whom she identified as the defendant, came into the store carrying a shotgun. The defendant took the money from the cash register, forced Mrs. Hicks to the back of the store and left. On appeal the defendant argued that Mrs. Hicks's testimony was erroneously admitted because it tended to show he had committed an unrelated criminal offense. In an opinion by Chief Justice Bobbitt, this Court rejected the defendant's contention as follows: "Although in different counties, the distance from the Flash Market to Moorefield's Grocery was three and a half miles or less. The interval between the robbery at the Flash Market and the robberies at Moorefield's Grocery was brief. Both were committed hurriedly by an unmasked man. In each, the mode of procedure was the same, that is abrupt entrance into a lighted store with a shotgun pointed toward the occupant(s) and an immediate demand for the money. Proximity in place and time and similarities in method were relevant for consideration by the jury as to whether the man identified by her as the defendant and who had robbed the Flash Market was also the man who had committed the crimes for which defendant was on trial. We hold that the testimony of Mrs. Georgia Hicks was competent on the question of identity and properly admitted. *State v. McClain,* 282 N.C. 357, 362-63, 193 S.E. 2d 108, 111-12 (1972), and cases there cited." *Id.* at 522, 201 S.E. 2d at 888.

In *State v. McClain,* 282 N.C. 357, 193 S.E. 2d 108 (1972) the defendant was charged with rape. The victim, who identified the defendant at trial, testified that as she walked home alone

from the State University library late one night the defendant grabbed her from behind and threatened to kill her if she screamed. Thereafter, holding a metal teasing comb to her throat, he forced her to accompany him to his car. He then drove to a secluded spot where the rape occurred. Over the defendant's objection, the State introduced the testimony of another woman who was accosted a week later by a man whom she identified as the defendant. According to her, she had just returned home alone late one night and was leaving her car when the defendant grabbed her and threatened her. He held a metal comb to her throat and forced her to return to her car. The defendant then took her keys and drove away. Fortunately, police stopped the vehicle because of defective lights and his second victim was not sexually assaulted. On appeal we rejected the defendant's contention that the testimony of the second victim was incompetent because its sole purpose was to prove guilt of an independent and unrelated crime. The evidence was held admissible to identify the defendant as the perpetrator of the crime charged and to establish a plan or scheme embracing the commission of a series of related crimes.

After examining in detail the various similarities in the nature and manner of the attacks upon the two victims, Justice Huskins, writing for the Court, in *State v. McClain, supra,* said: "The enumerated similarities tend to show a *modus operandi,* a common plan embracing the commission of both crimes, and also establish a chain of circumstantial evidence tending to identify defendant as the man who raped Miss Elliott. Thus, evidence of the Conklin offense was admissible and should not be rejected because it incidentally proves defendant guilty of another crime. Its logical relevance to the rape of Miss Elliott is obvious. The trial judge instructed the jury to consider such evidence 'only as it relates to the identity of the defendant, Horace Ray McClain,' as the man who raped Miss Elliott on 13 October 1971. It was competent on the question of identity and properly admitted. (Cites omitted.)" *Id.* at 362-63, 193 S.E. 2d at 111-12.

Finally, in *State v. Perry, supra,* the defendant was charged with rape. The victim, who identified the defendant at trial, testified that during the course of the crime, the defendant told her he had just gotten out of prison on the previous day. Over the defendant's objection the State introduced evidence showing the defendant had been released from prison on the day pre-

ceding the rape. On appeal the defendant contended this evidence was incompetent because it showed his guilt of a separate, independent crime, unrelated to the one of which he was charged. After noting the rule that evidence of other offenses is inadmissible on the issue of the defendant's guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature charged, the Court said: "It is, however, equally well settled that evidence relevant to the question of the identity of the accused with the perpetrator of the offense with which he is presently charged is not rendered incompetent by the mere fact that it discloses the commission by him of some other criminal offense. . . . Where the identity of the defendant and the perpetrator of the offense with which he is charged is at issue, the evidence tending to show his commission of another criminal offense, and thereby to show his identity with the perpetrator of the offense with which he is presently charged, is not rendered incompetent by the fact that a witness has testified to such identity." *Id.* at 571, 169 S.E. 2d at 843.

The present case is controlled by these authorities. The crucial issue in the trial below was not whether Mrs. Hardin was raped in the manner in which she said she was but whether defendant McEachern was one of the two men who participated in the crime. The circumstances surrounding the attack on Walters and Grainger were similar to the attack upon Mrs. Hardin and her husband in the following respects: (a) In both, the victims were approached as they sat parked in the same secluded Lover's Lane; (b) in both, the attackers were two black men— one medium height and the other much shorter; (c) in both, the larger man had a nylon stocking pulled over the upper half of his face; (d) in both, all the victims were ordered from the cars and the men ordered to sit on the ground; (e) a sawed-off shotgun was used as a weapon in both attacks, (f) the primary motive for both attacks was rape of the female victims; and (g) in both instances the perpetrators drove a car with unusually loud mufflers. These similarities, coupled with the fact that the attacks occurred within one half hour of one another, point unmistakably to the conclusion that the same men who attempted to rape Miss Grainger did rape Mrs. Hardin. Thus, the testimony identifying the defendant as one of the two men who attacked Miss Grainger was competent and admissible to establish that he was also one of the men who raped Mrs. Hardin. McEachern's assignments Nos. 5 and 9 are overruled.

McEachern's assignment No. 10, upon which he bases his second contention, protests a portion of the solicitor's argument to the jury. As to this assignment, it suffices to say (1) that defendant made no objection to the argument at the time it was made, and (2) that the substance of the argument was that the jury should believe the State's witnesses and not defendant McEachern and his witnesses. Defendant has advanced no tenable argument to support his assertion that the solicitor's remarks improperly influenced the verdict, and we are satisfied that they did not. Assignment No. 10 is overruled.

[2] Defendant's third contention, based on his assignment No. 14, is that the court erred in imposing upon him the death penalty. This assignment must be sustained.

After the preparation of this opinion but before it was filed, the Supreme Court of the United States in *Woodson v. North Carolina*, ____ U.S. ____, 44 L. W. 5267 (1976), a five-to-four decision filed 2 July 1976, invalidated the death penalty provision of G.S. 14-17 (Cum. Supp. 1975). By necessary implication, this decision also invalidated the death provisions of G.S. 14-21 (a) (2) (Cum. Supp. 1975), the statute under which defendant was convicted and sentenced to death. Therefore the judgment in case No. 75 CR 2366, which imposed the sentence of death upon defendant McEachern, is vacated; and, under the authority of N. C. Sess. Laws, c. 1201, § 7 (1973), (session of 1974), the sentence of life imprisonment is substituted in lieu thereof.

Accordingly, it is hereby ordered that, upon remand of this cause to the Superior Court of Robeson County, the presiding judge, without requiring the presence of defendant McEachern, shall enter a judgment of life imprisonment in lieu of the sentence of death heretofore imposed upon him for the first degree rape of which he has been convicted. Further, in accordance with this judgment, the clerk of the superior court will issue a new commitment in substitution for the commitment heretofore issued. At the same time the clerk will furnish to defendant McEachern and his attorney a copy of the judgment and commitment as revised in accordance with this opinion.

### THOMPSON'S APPEAL

Defendant Thompson brings forward numerous assignments of error. Because of the disposition we are required to

make of his appeal it is necessary to examine only two assignments, Nos. 6 and 9.

First, we consider the assignment that the court erred in not granting Thompson's motion to nonsuit the charge of first degree rape. Specifically, defendant contends the evidence is insufficient to establish that Mrs. Hardin's resistance to him was overcome, or her submission procured, through his use of a deadly weapon.

In *State v. Dull*, 289 N.C. 55, 220 S.E. 2d 344 (1975), this Court examined the sufficiency of the evidence to withstand the defendant's nonsuit motion directed at the charge of first degree rape as defined in G.S. § 14-21(a)(2). In *Dull*, the State's evidence established that the defendant jumped into the victim's car as she was leaving the parking lot of a shopping center, pulled her head back with his left hand, and held an open knife against her throat with his right. The defendant told the victim to do as she was told and she would not get hurt. Then, with the knife still at her throat, he directed her to drive toward a certain highway. As she did so, the defendant put the knife away and the victim did not see it again. After several miles of travel the defendant directed the victim to stop the car. When she did he began to fondle her body, telling her he would kill her if she did not do as he said. The defendant then drove to a secluded spot where he had intercourse with the victim. She testified that she knew he still had the knife even though she did not see it at the time; that she was afraid the defendant would kill her; and that this fear caused her to submit to him.

In rejecting the defendant Dull's contention that the evidence was insufficient to establish that the victim's resistance was overcome or her submission procured by the use of a deadly weapon, we held: Accepting the evidence of the State as true "it is clear that the requirements of G.S. 14-21(a)(2) were met and that the submission of the prosecutrix was procured by the use of the open knife that the defendant placed at her throat when he first encountered her." *Id.* at 60, 220 S.E. 2d at 347. To make out a case of first degree rape the State was not required to show that the defendant continued "to display the deadly weapon in a threatening manner until the moment of the rape. The defendant told the prosecutrix she would not live to be nineteen if she did not cooperate with him. She had every reason to believe that he would carry out his threat to kill her.

Once the defendant had exhibited the knife and threatened the life of the prosecutrix with it, the knife continued in use as long as it was accessible to him." *Id.* at 60, 220 S.E. 2d at 347.

**[3]** The decision in *Dull* is authority for the proposition that a deadly weapon is used to procure the subjugation or submission of a rape victim within the meaning of G.S. 14-21(a)(2) when (1) it is exhibited to her and the defendant verbally, by brandishment or otherwise, threatens to use it; (2) the victim knows, or reasonably believes, that the weapon remains in the possession of her attacker or readily accessible to him; and (3) she submits or terminates her resistance because of her fear that if she does not he will kill or injure her with the weapon. In other words, the deadly weapon is used, not only when the attacker overcomes the rape victim's resistance or obtains her submission by its actual functional use as a weapon, but also by his threatened use of it when the victim knows, or reasonably believes, that the weapon is readily accessible to her attacker or that he commands its immediate use.

**[4]** The State's evidence brings its case against Thompson within the principles enunciated in *Dull*. Taking the evidence as true, as we must on a motion for nonsuit, *State v. Goines*, 273 N. C. 509, 160 S.E. 2d 469 (1968); *see also* 2 Strong's N. C. Index 2d *Criminal Law* § 106 (1967), it establishes that defendants McEachern and Thompson entered into a conspiracy to kidnap and rape the first woman they encountered in the Lover's Lane. Pursuant to this conspiracy, Thompson drove them to the Lover's Lane, participated in the abduction of Mrs. Hardin at gunpoint, and then drove to a secluded house he had rented for the crop season (1975) while McEachern threatened Mrs. Hardin with the gun. At the house McEachern raped Mrs. Hardin in the automobile while holding the gun in his hand and desisted only when Thompson signaled him by tapping on the window. Thompson then told Mrs. Hardin to come with him and, McEachern, while still holding the gun, ordered her to do so. As Thompson led Mrs. Hardin to a bedroom inside the house he told her if she did what he wanted her to do he would not let "the other guy" kill her. Inside the house Thompson continually cautioned her "to do just like he told her to do and [she] would not be killed." In fear for her life she complied with his demands and, when he had finished with her, he ordered her to "get out in the yard or the big guy would be coming in." The evidence shows that Thompson then drove the

three back into town in his car while McEachern was again raping Mrs. Hardin at gunpoint in the back seat of the automobile.

This evidence permits the inference that Thompson procured Mrs. Hardin's submission through the use of a deadly weapon and is sufficient to overcome defendant's nonsuit motion. The evidence tends to show that Thompson commanded the use of McEachern's gun and that the gun was immediately available to him upon a tap on the window. It also permits the inference that Mrs. Hardin submitted to Thompson only because of his threats to let "the big guy kill her" if she did not and because of her knowledge that the big guy's gun was instantly available to Thompson.

Furthermore, the evidence permits the inference that Thompson aided and abetted McEachern in his two rapes of Mrs. Hardin. As we said in *State v. Overman*, 269 N.C. 453, 153 S.E. 2d 44 (1967) : "It is, of course, well settled that one who is present, aiding and abetting, in a rape actually perpetrated by another, is equally guilty with the actual perpetrator of the crime. *State v. Johnson*, 226 N.C. 671, 40 S.E. 2d 113 (1946) ; *State v. Hall*, 214 N.C. 639, 200 S.E. 375 (1939). Upon this ground even a woman may be convicted of rape, and a husband be guilty of raping his wife. (Cites omitted.)" *Id*. at 473, 153 S.E. 2d at 60. *See also* 2 Strong's N. C. Index 2d *Criminal Law* § 9 (1967).

As an aider and abettor Thompson would be criminally responsible for the acts of McEachern and would be guilty of first degree rape if McEachern was regardless of whether Thompson himself had actually raped Mrs. Hardin. Taken as true, Mrs. Hardin's testimony clearly establishes McEachern's guilt of first degree rape as defined by G.S. 14-21(a)(2) and Thompson's guilt as an aider and abettor to McEachern's crime. Thus on this ground alone defendant Thompson's nonsuit motion was properly denied. We next consider assignment No. 9.

As set out in the preliminary statement defendant Thompson offered evidence tending to establish an alibi defense. *Inter alia,* he stated that he arrived at his home at 2:00 a.m. and went in to bed. On cross-examination he was questioned about the circumstances surrounding his arrival home at that hour. The time was important because, according to Mrs. Hardin, her attackers would have still been with her at 2:00 a.m. He said

that when he got home his wife would not get out of bed to let him in and, because the screen door was locked, he had to crawl through a window into his house. Apparently, in response to the solicitor's question defendant said: "Yes, my wife knew it was me when I came through the window; she is not here in the courtroom; as I told you once before, she is in Connecticut."

After he testified, Thompson called several witnesses whose testimony tended to corroborate his alibi. He did not, however, call as a witness every person whom he said he had seen on the night in question. One of the witnesses he did not call was his wife.

[5] In his argument to the jury the solicitor the Honorable Joe Freeman Britt, attacked defendant's credibility and that of his alibi witnesses. The solicitor suggested that defendant had persuaded some of his friends to perjure themselves in his behalf. Then, in an effort to illustrate the weakness of defendant's alibi, the solicitor pointed out to the jury that defendant had not called as witnesses other people who, he said, had been in contact with him on the night in question and who could have easily corroborated his testimony. The solicitor implied that defendant had not called these people because he could not persuade them to lie for him. At this point the solicitor said: "He [defendant] says after he took the girls over there to the Patio and left them he came back home and slipped up the window and crawled in the house at 2:00 o'clock in the morning; that his wife knew he came in because his wife knows everything, he says. Have you heard from his wife? I can't use a man's wife against him, but he can use his wife for himself. Wouldn't she be a good person to tell you when he came in and how he got in the house? Have you heard from her?"

This argument was outlawed by G.S. § 8-57, which provides in pertinent part: "The husband or wife of the defendant, in all criminal actions or proceedings, shall be a competent witness for the defendant, but the failure of such witness to be examined shall not be used to the prejudice of the defense. . . . "

Recently, in *State v. McCall*, 289 N.C. 570, 223 S.E. 2d 334 (1976), we considered the impact of G.S. § 8-57 and the cases which have applied it. In *McCall*, the defendant was charged with first degree murder of his wife's son. The homicide occurred before the defendant and his wife were married

and she was the only witness to it. Subsequent to the homicide, but prior to his trial, the defendant and his wife were married. At trial the defendant testified but his wife did not. Over his objection, the State cross-examined him concerning the timing of his marriage and his knowledge of the statute prohibiting the use of a spouse's testimony against the marriage partner. The district attorney, without objection, argued to the jury that the defendant had married his wife to silence her testimony and to prevent the truth from being known. He commented upon the statutory prohibition and argued that the defendant would have put his wife on the stand if her testimony would have been favorable to him. On appeal the defendant assigned as error the cross-examination and jury argument concerning the failure of his wife to testify in his behalf.

This Court in granting the defendant a new trial said: "The provisions of G.S. 8-57, and decisions of this Court interpreting and applying them, impel the conclusion that where evidence is rendered incompetent by statute, it is the duty of the trial judge to exclude it, and his failure to do so is reversible error, whether objection is interposed and exception noted or not. *Hooper v. Hooper,* 165 N.C. 605, 81 S.E. 933 (1914). In such case it is the duty of the judge to act on his own motion. (Cites omitted.) The rule applies with equal force to the argument of counsel when evidence forbidden by statute is argumentatively placed before the jury and used to the prejudice of the defense. When this occurs it is the duty of the judge *ex mero motu* to intervene and promptly instruct the jury that the wife's failure to testify and the improper argument concerning that fact must be disregarded and under no circumstances used to the prejudice of the defendant." *Id.* at 577-78, 223 S.E. 2d at 338.

The decision in *State v. McCall, supra,* and the cases cited therein, control the decision on Thompson's assignment No. 9. As in McCall the solicitor's argument violates both the letter and the spirit of G.S. § 8-57. Indeed, it would be difficult to imagine a case where the wife's failure to testify would be potentially more prejudicial to a defendant. Here her testimony would have aided the establishment of his alibi. By highlighting to the jury the fact that she was not a witness, the district attorney, in violation of G.S. § 8-57, used the failure of the wife to testify for her husband to the prejudice of defendant. Notwithstanding the failure of the defendant's counsel to object to the argument it was incumbent upon the trial judge,

on his own initiative, to intervene and to instruct the jury to disregard the solicitor's argument. *State v. McCall, supra.* His failure to do so was error and, on the record before us, we cannot say that the error was harmless.

We feel constrained to point out that the primary error in this case is not the judge's but the solicitor's. The retrial which must be had in this case is necessitated by his flagrant disregard of a mandatory rule which has been well-known statutory law in this State for over a hundred years. *See State v. Alford,* 274 N.C. 125, 161 S.E. 2d 575 (1968).

The State has no greater asset than a vigorous solicitor, learned in the law and dedicated to its enforcement, who investigates and prosecutes the State's case according to the rules of law. In him the judge and jury, the public, and the accused can safely repose confidence. However, an able and vigorous solicitor who, in his zeal for conviction ignores a well known legal principle, serves no cause or person well—unless perhaps it be the guilty defendant who, on the retrial, escapes justice because intervening time has made unavailable a crucial State's witness. The taxpayers pay the expense of the retrial, another and unnecessary case is added to the already congested docket, justice is delayed not only in the particular case but also in others, witnesses are inconvenienced, and the strain upon all persons directly involved in the case—especially the victim of the crime—is compounded.

In both *State v. Peplinski,* 290 N.C. 236, 225 S.E. 2d 568, (filed 17 June 1976) and *State v. Covington, et al,* 290 N.C. 313, 226 S.E. 2d 629 (filed this day), Solicitor Britt successfully prosecuted the defendants for murder in the first degree. In each we found no prejudicial error. Yet we felt compelled to note that, except for the trial judge's prompt rulings and cautionary instructions and the overwhelming evidence against defendants, the solicitor's continued attempt to cross-examine his own witness in the one case and his improper argument to the jury in the other could well have needlessly required a new trial.

In *State v. Britt,* 288 N.C. 699, 220 S.E. 2d 283 (1975), we were forced to award a new trial in a first degree murder case because this same solicitor's "courtroom tactics transcended the bounds of propriety and fairness" and "were highly improper and incurably prejudical." We would not attempt to improve

State v. Thompson

upon the succinct and forceful statement of Justice Huskins, who wrote the opinion for the Court in *State v. Britt*. We repeat the essence of it here:

"The balance between the dual roles of the district attorney as impartial representative of the people, and zealous advocate for the State is a delicate one. Yet according fair treatment to the defendant does not require a compromise of advocacy, for zealousness and fairness are complementary qualities in an effective prosecution where the goal to be achieved is what it should be—a just conviction of the guilty. . . . The district attorney who prosecuted this case most likely committed the excesses noted by an overzealous desire to secure the conviction of an accused he believed to be guilty of murder. In that connection the following admonition of Justice Ervin, speaking for the Court in *State v. Warren*, 235 N.C. 117, 68 S.E. 2d 779 (1952), is most appropriate:

" 'Ministers of the law ought not to permit zeal in its enforcement to cause them to transgress its precepts. They should remember that where the law ends, tyranny begins.' " *Id.* at 714, 220 S.E. 2d at 293.

It remains only to be said that the purpose of this repeated reprimand of the solicitor of the Sixteenth Judicial District is not to dampen his zeal as an advocate for the State but—since repetition is one method of teaching—to reiterate that prosecuting attorneys can best serve the cause of justice by themselves observing the law. *See State v. Miller*, 288 N.C. 582, 603, 220 S.E. 2d 326, 340-41 (1975) (Sharp, C. J., concurring).

As to defendant Thompson — New Trial.

As to defendant McEachern, Death Sentence Vacated, and in lieu thereof, Life Sentence Substituted. In the verdict—

No error.