STATE OF NORTH CAROLINA v. DEWEY L. GRAY, JR.

No. 85

(Filed 14 April 1977)

**1. Constitutional Law § 31— indigent defendant — appointment of investigator, expert**

The State is required by G.S. 7A-450(b) and 7A-454 to provide an indigent defendant with a private investigator or expert assistance only upon a showing that there is a reasonable likelihood that defendant will be materially assisted in the preparation of his defense or that without such help it is probable that defendant will not receive a fair trial, and neither the State Constitution nor the Federal Constitution requires more.

**2. Constitutional Law § 31— indigent defendant — denial of appointment of investigator, serologist**

The trial court in a rape case did not err in the denial of the indigent defendant's pretrial motion that the State furnish him a private investigator where there was no showing for the necessity of a private investigator; nor did the court err in the denial of defendant's motion that the State furnish him an expert in serology to aid in defense counsel's preparation for the cross-examination of the State's expert chemist who testified regarding blood groupings ascertained by examining fluids taken from the victim, a male friend of the victim, and defendant, and from a cigarette butt found in the victim's apartment, where the court ordered that the chemist be available to defense counsel for examination under oath at State expense well before trial.

**3. Constitutional Law § 46— withdrawal of attorney**

An attorney of record may withdraw from the case only upon satisfying the court that his withdrawal is justified.

**4. Constitutional Law § 46— refusal to dismiss court-appointed counsel**

In this prosecution for rape, burglary and felonious assault, the trial court did not err in the denial of defendant's motion to dismiss his court-appointed attorney on grounds that the attorney had urged defendant to plead guilty to first degree burglary, had "misled" defendant, his wife and mother, hadn't come to see defendant regularly, and had served as an assistant district attorney, since it is clear that defendant had no reasonable objection to his attorney's conduct or preparation of his case, and the court had no reason to believe that the relationship between defendant and his counsel had deteriorated so as to prejudice the presentation of his defense.

**5. Constitutional Law § 46— desire to employ counsel — refusal to dismiss court-appointed counsel**

Defendant's assertion that he wished to employ his own counsel, made on the day trial was to begin without the appearance or even the name of a single attorney who might be privately employed to

State v. Gray

represent him and with no claim that he had funds to employ counsel, was no ground for dismissal of his court-appointed counsel.

6. Constitutional Law § 46— court-appointed counsel — former assistant district attorney — motion to dismiss

Court-appointed counsel's brief former tenure as an assistant district attorney constituted no conflict of interest which would require his dismissal upon motion by defendant.

7. Criminal Law § 55.1— blood grouping tests

The results of blood grouping tests are generally admissible in criminal trials.

8. Criminal Law § 55.1— blood grouping tests — relevancy in rape trial

The results of blood grouping and absorption inhibition tests establishing that a vaginal fluid sample taken from an alleged rape victim contained type "B" or "AB" blood, that the victim and a male friend of the victim had type "A" blood, and that defendant had type "B" blood were relevant in this rape prosecution to negate a possible defense contention that semen found in the victim's vagina was deposited in a consensual sexual encounter by the victim's male friend.

9. Criminal Law § 55.1— blood absorption inhibition tests — reliability and validity

The reliability and validity of absorption inhibition tests were sufficiently demonstrated to render them admissible in a rape prosecution where an expert forensic chemist testified that both defendant and the victim were "secretors" whose blood types could be determined from body fluids other than blood, the witness testified at length to his methodology, and the witness conducted the tests himself and was carefully precise in his testimony.

10. Criminal Law § 72— age — lay opinion testimony

Lay witnesses who had adequate opportunity to observe and in fact did observe defendant may state their opinion regarding the age of a defendant in a criminal case when the fact that he was at the time in question over a certain age is one of the essential elements to be proved by the State; therefore, the trial court in a rape case properly permitted lay opinion testimony regarding defendant's age for the purpose of proving that he was more than sixteen years of age at the time of the rape, this being an essential element of the crime.

11. Criminal Law §§ 72, 80.1— certificate showing birth certificate information — no official record — inadmissibility

A "Certified Certificate of Birth" signed by a Deputy Registrar which was no more than the Deputy Registrar's assertion of what she found on the recorded birth certificate was double hearsay and inadmissible in a rape prosecution to show defendant's age since the certificate was not a certified copy of any official record so as to be admissible under G.S. 130-66, 8-34, or 8-35, and there was no showing that it was certified by the State Registrar or an authorized agent thereof; however, the admission of the certificate was rendered harm-

State v. Gray

less by defendant's own testimony establishing that he was more than sixteen years old at the time the rape occurred.

**12. Criminal Law § 29.1— denial of motion for mental examination**

The trial court did not err in the denial of defendant's pretrial motion for a mental examination to determine his capacity to stand trial without conducting a formal inquiry into his mental capacity where the only evidence in support of the motion was counsel's assertion that defendant's apprehension of the seriousness of the charge against him had failed to inspire any effective communication by defendant with counsel, and the record contains nothing to indicate defendant's incapacity to stand trial and demonstrates his understanding and articulation concerning the charges against him.

**13. Criminal Law § 66.9— pretrial photographic procedures — defendant's different hairdo**

Pretrial photographic procedures were not unnecessarily suggestive because defendant's hairdo was different from others in the stack of photographs since the hairdo was not the basis for the identification of defendant.

**14. Criminal Law § 66.12— identification at preliminary hearing — effect on in-court identification**

Rape victim's in-court identification of defendant was not tainted by her identification of defendant at the preliminary hearing, where he was the only black male in the courtroom, where there was no evidence that her identification of him at the preliminary hearing had any effect on her identification at trial.

**15. Criminal Law § 66.14— in-court identifications — independent origin**

The trial court in a rape case properly admitted the in-court identifications of defendant by a rape victim and another witness where the court determined upon supporting evidence that pretrial identification procedures were not impermissibly suggestive and that the in-court identifications arose independently, from adequate observation at the time of the crime, and were not tainted by any pretrial conduct of any law enforcement officer or court personnel.

**16. Criminal Law § 62— denial of polygraph test**

Defendant's rights to confrontation, counsel, due process and equal protection were not violated by denial of his pretrial motion to undergo a polygraph examination, particularly since defendant refused the State's offer to administer a polygraph examination on condition that defendant and the State stipulate the admissibility of the results.

**17. Criminal Law §§ 42.3; 84— rape case — coat worn by assailant — variance in description in warrant and actuality**

Although an affidavit for a search warrant contained a rape victim's description of the coat worn by her assailant as a "brown three-quarter length coat with fur collar," a black and white tweed three-quarter length coat with a fur collar seized pursuant to the warrant was relevant and properly admitted in defendant's trial for

State v. Gray

rape since the variance in description and actuality of the color affected the weight but not the admissibility of the evidence, and the description in the warrant was sufficiently precise to preclude any doubt that the coat seized was the one authorized to be taken.

18. Rape § 5—submission procured by use of gun—sufficiency of evidence

The State's evidence in a rape case was sufficient to permit the inference that the victim's submission was procured through the use of a gun defendant carried and was sufficient to overcome defendant's motion for nonsuit of the charge of first degree rape where it tended to show that defendant carried a gun with a "very long barrel" in full view and waved it in his hands, that the victim told her companion, "Run. He has a gun," then returned to her apartment, locked the door and called the police, and that defendant kicked the door in, discovered her hiding place and dragged her out of the apartment and into a field where he had intercourse with her, again brandishing the gun in one hand.

19. Rape § 3—indictment—procurement of submission—two means alleged conjunctively

An indictment for rape charging that the prosecutrix had her resistance overcome or her submission procured "by the use of a deadly weapon and by the infliction of serious bodily injury" correctly charged the offense of first degree rape, and defendant was not prejudiced by the inclusion of the "serious bodily injury" allegation where the court submitted the issue of first degree rape to the jury solely on the theory, supported by the evidence, that the victim's submission was procured by the use of a deadly weapon.

20. Indictment and Warrant § 17— two means alleged conjunctively— proof of one — variance

Where an indictment sets forth conjunctively two means by which the crime charged may have been committed, there is no fatal variance between indictment and proof when the State offers evidence supporting only one of the means charged.

21. Rape § 7—death sentence vacated—substitution of life imprisonment

Sentence of death imposed for first degree rape is vacated and the case is remanded for substitution of a sentence of life imprisonment.

DEFENDANT appeals from judgment of *Thornburg, J.,* at the 23 June 1975 Session of MECKLENBURG Superior Court. Docketed and argued as No. 106, Fall Term 1975.

*Rufus L. Edmisten, Attorney General, by Edwin Speas, Jr., Special Deputy Attorney General, and Jack Cozort, Associate Attorney, for the State.*

*Tate K. Sterrett, Attorney for defendant appellant.*

EXUM, Justice.

Upon separate bills of indictment defendant was tried and convicted of first degree rape (75-CR-2774), assault with a deadly weapon with intent to kill resulting in serious bodily injury (75-CR-2775), and first degree burglary (75-CR-2776). He was sentenced, respectively, to death, twenty years imprisonment, and life imprisonment.

Incorporated within twenty questions presented in his brief, defendant brings forward some twenty-eight assignments of error, the most significant of which challenge the: (1) trial court's refusal to appoint a private investigator and an expert witness to assist in the defense; (2) denial of defendant's motion to dismiss court-appointed counsel and counsel's motion to be permitted to withdraw; (3) admissibility of certain blood grouping and absorption inhibition tests; and (4) admissibility of lay opinion testimony as to defendant's age and a so-called "Certified Certificate of Birth." We find no merit in any of defendant's assignments of error relating to the trial of the cases. We do, however, vacate the death sentence entered in the rape case and remand this case for the entry of a sentence of life imprisonment.

The state's evidence tends to show the following: At about 11:00 p.m. on 12 January 1975, Louise Johns was at home in her apartment at 609 Key Street in Charlotte with a friend, Robert Griffith. They heard a knock at the front door. Thinking the visitor might be Griffith's wife, from whom he was separated, Griffith exited the apartment through the back door while Mrs. Johns proceeded to answer the door.

When she opened the door, Mrs. Johns encountered a black man whom she mistakenly thought she recognized as a neighbor's son. The man asked to use her phone but she told him it was out of order and suggested he use a neighbor's phone. When he was insistent she again refused. Mrs. Johns quickly apprehended her mistake as to the visitor's identity as she observed him in the strong light in the doorway. She was close enough to the man to smell alcohol on his breath.

The man pushed his way through the door with a long-barreled pistol in his hand. He was smoking a cigarette and dropped it on the carpet. Upon his inquiry, Mrs. Johns told him someone had just left the apartment. He instructed her to

"go get rid of them." Mrs. Johns went to Griffith, who was standing in front of the apartment and said, "Run. He has a gun." Griffith ran after Mrs. Johns but was confronted by the black man, who pointed a "big gun" at his stomach and threatened to kill him. At this time Mr. Griffith was standing in the parking lot where there was sufficient illumination from a street light that he could see the man's face clearly. From Griffith's and Mrs. Johns' descriptions the man was tall and thin-faced, wearing a three-quarter length coat with a fur collar and a small hat. Griffith was edged toward his car by the gunman, got into it and drove away to a phone booth from which he tried to call Mrs. Johns, but got no answer.

Mrs. Johns ran back into her apartment, locked the door and called police, giving her name and address. Then she went upstairs and hid in her bedroom closet. The man, having kicked in the door, soon discovered her hiding place, grabbed her around the neck and dragged her down the stairs and out the back door. He told her not to scream and waved the gun. Still holding Mrs. Johns by the neck, the man dragged her down an embankment and into a field behind the apartment building. He pushed her down and ordered her to undress. After Louise Johns had pulled down her jeans and the man had undressed, he began having sexual intercourse with her, and then forced her to have oral sex with him. The man then resumed having intercourse until he ejaculated.

Mrs. Johns testified that her assailant hit her on the head with the butt of his gun after the completed act of intercourse, dazing her. She said he began beating her and that she thought she was stabbed but did not see a knife. The man walked quickly back towards the apartment building. Mrs. Johns walked to the front of the apartment building where she saw a police car with the door open. She fell into the car, told police what had happened and gave them a description of her assailant.

Mrs. Johns was taken by ambulance to a hospital, where she underwent surgery to repair damage resulting from deep puncture wounds to her stomach, diaphragm and colon. Her scalp was also sutured. At the hospital Mrs. Johns told police that her assailant was not her neighbor's son, although he looked something like him. (Defendant is the brother of the man whom Mrs. Johns knew as her neighbor's son.) Medical testimony established the presence of spermatozoa in a vaginal fluid sample

taken from Mrs. Johns. Testimony of an expert witness established the presence of blood type "B" in this sample. Mrs. Johns and Griffith both had blood type "A." The defendant had blood type "B."

At trial Mrs. Johns and Robert Griffith positively identified defendant as the assailant.

Two police officers arrived at the apartment complex soon after Mrs. Johns' call, but found no one at her apartment, although they saw the dead bolt lock hanging by one screw. In cruising the parking lot using their spotlight these officers saw a man who met the description later given them by Mrs. Johns, but the man disappeared before the officers could apprehend him. At trial both officers positively identified defendant as the man they saw in the parking lot.

Defendant presented an alibi defense. He testified himself that he was with friends at the Red Bird Lounge or Club until 10:00 or 10:30 on the night of the crime, that he went home alone, watched TV and went to sleep. His testimony was corroborated by the friends he named as his companions that evening.

## I

By his first assignment of error defendant, an indigent, contends the court erred in denying his pre-trial motion that the state furnish him for the purpose of assisting in his defense an expert in serology and a private investigator. We fully considered the questions presented by this assignment in *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976) and *State v. Montgomery*, 291 N.C. 91, 229 S.E. 2d 572 (1976). In these cases defendants' pre-trial motions for appointment of private investigators at state expense were held properly denied. Recognizing that General Statute 7A-450 (b) requires the state to provide an indigent defendant "with counsel and the other necessary expenses of representation," the Court in *Tatum* held that an order for the appointment of a private investigator "should be made with caution and only upon a clear showing that specific evidence is reasonably available and necessary for a proper defense. Mere hope or suspicion that such evidence is available will not suffice." 291 N.C. at 82, 229 S.E. 2d at 568. To similar effect was the statement in *Montgomery* that "[t]his statute has never been construed to extend to the employment of an

State v. Gray

investigator in the absence of a showing of a reasonable likelihood that such an investigator could discover evidence favorable to the defendant. We decline so to construe it. We do not have before us . . . the right of an indigent defendant to have such an investigator employed at the expense of the State upon a showing of a reasonable basis for belief that such employment would be productive of evidence favorable to him." 291 N.C. at 97-98, 229 S.E. 2d at 577. These cases also established that denial of a state-paid private investigator to an indigent defendant did not, *ipso facto,* constitute a denial of equal protection of the laws notwithstanding that such investigators might be available to indigent defendants represented by public defenders, G.S. 7A-468, and to pecunious defendants.

We recognized in *Tatum* that "all defendants in criminal cases shall enjoy the right to effective assistance of counsel and that the State must provide indigent defendants with the basic tools for an adequate trial defense or appeal." 291 N.C. at 80, 229 S.E. 2d at 566-67. While in *Tatum,* we determined to adhere to the holding in *United States ex rel. Smith v. Baldi,* 344 U.S. 561 (1953) (the state has no constitutional duty to provide an expert witness to assist in the defense of an indigent), we said, further, that "we do not interpret *Baldi* to obviate the doctrine of 'fundamental fairness' guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution." 291 N.C. at 81, 229 S.E. 2d at 567. We concluded in *Tatum* that the appointment of experts to assist an indigent in his defense depends really upon the facts and circumstances of each case and lies, finally, within the discretion of the trial judge. *See also* G.S. 7A-454 providing for payment in the court's discretion of a fee for an expert witness who *testifies* for an indigent defendant.

We know, of course, that the assistance of an expert or private investigator or both would be, generally, welcomed by all defendants and their counsel as an added convenience to the preparation of a defense. *State v. Tatum, supra.* We must, however, also recognize that it is practically and financially impossible for the state to give indigents charged with crime every jot of advantage enjoyed by the more financially privileged. *See State v. Patterson,* 288 N.C. 553, 220 S.E. 2d 600 (1975), *death sentence vacated,* 96 S.Ct. 3211 (1976). "And the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally re-

quired." *Ross v. Moffitt*, 417 U.S. 600, 616 (1974). There are usually other methods by which defense counsel himself, without the use of investigators or experts, can uncover information or educate himself regarding a particular scientific discipline.

**[1]** There are, then, no constitutional or legal requirements that private investigators or expert assistance *always* be made available simply for the asking. *See, generally*, "Right of Indigent Defendant in Criminal Case to Aid of State by Appointment of Investigator or Expert," Annot., 34 A.L.R. 3d, 1256 (1970). Our statutes, G.S. 7A-450(b) and 7A-454, as interpreted in *Tatum* and *Montgomery* require that this kind of assistance be provided only upon a showing by defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense or that without such help it is probable that defendant will not receive a fair trial. Neither the state nor the federal constitution requires more.

**[2]** Defendant here really makes no showing or serious argument for the necessity of a state-appointed private investigator. He does argue vigorously that the appointment of an expert in serology was necessary for effective cross-examination of the state's expert, Brian Stemball, an SBI chemist, who testified regarding blood groupings ascertained by examining certain fluids taken from the bodies of Mrs. Johns, Mr. Griffith and defendant and from a cigarette butt found in Mrs. Johns' apartment.

We do not find the argument persuasive. In its order denying defendant's motion to appoint an expert and investigator, the court provided that Brian Stemball would be available to defense counsel for examination under oath at state expense well before trial. Defendant thus had ample opportunity to discover the procedures used in the blood grouping tests and the expert's opinion regarding the results he obtained. The able cross-examination of Stemball at trial well demonstrates that defense counsel was amply prepared for this phase of the trial.

Since the facts and circumstances reveal no real necessity for the appointment of an expert serologist or a private investigator in the preparation of an adequate defense, it was not error to deny defendant's motion.

## II

Defendant next claims error in the denial of his motion to dismiss his court-appointed attorney and the attorney's motion to withdraw from the case. We believe the court ruled correctly in denying both motions.

[3]  An attorney of record may withdraw from the case only upon satisfying the court that his withdrawal is justified. *Smith v. Bryant,* 264 N.C. 208, 141 S.E. 2d 303 (1965). Defendant's attorney, in support of his motion to withdraw, cited only the reasons set forth by defendant in his motion to dismiss counsel. Therefore, unless adequate justification was demonstrated by defendant it was not error to deny his attorney's motion to withdraw.

The United States Supreme Court has recognized a right to self-representation implicit in the Sixth Amendment and independent of defendant's power to waive the right to counsel. *Faretta v. California,* 422 U.S. 806 (1975). California was held to have violated that right when it imposed counsel upon a defendant who, weeks before trial, had "clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel." 422 U.S. at 835.[1]

In *State v. Sweezy,* 291 N.C. 366, 230 S.E. 2d 524 (1976), the defendant requested that his counsel be removed in order that two black counsel might be appointed. Since no substantial claim was asserted that defendant was denied effective assistance of counsel, and since an indigent defendant has no right to choose his appointed counsel, *State v. Robinson,* 290 N.C. 56, 224 S.E. 2d 174 (1976), we held there was no error in the denial of defendant's request in *Sweezy.* Addressing the informality of the pertinent exchange between the court and the defendant, but noting the defendant's vociferous insistence that his desires be known, we held the lack of a formal hearing in that case did not constitute reversible error. We nevertheless cautioned:

"It would have been the better practice for the trial judge to have excused the jury and allowed defendant to

---

[1] The Court nevertheless recognized that termination of self-representation by a defendant who deliberately and seriously disrupts court proceedings and appointment of stand-by counsel to assist a defendant representing himself if he should request such assistance during the trial were constitutionally permissible. 422 U.S. at 834, n. 46.

state his reasons for desiring other counsel. If no good reason was shown requiring the removal of counsel, then the court should have determined whether the defendant actually desired to conduct his own defense." *Id.* at 372, 230 S.E. 2d at 529.

Since there was no intimation that defendant Sweezy wished to represent himself, but only that he wanted "two black lawyers," and since "[d]efendant's courtroom behavior gave the trial judge every right 'to suspect the bona fides of the defendant,' " *Id.* at 373, 230 S.E. 2d at 529, there was no reversible error in the court's failure to follow the recommended procedure.

[4] In this case, defendant Gray moved at his arraignment on June 23, 1975, the day his trial was to begin, to dismiss his attorney on the grounds that his attorney had, on several occasions, urged defendant to plead guilty to first degree burglary. In addition, he complained that the attorney had "misled" defendant, his wife and mother and had "put distrust" in his witnesses' hearts. Defendant also said he and his attorney had not been able to communicate because "he hasn't been coming to see me and when he does come to see me his only objective is to get me to plead guilty." Defendant concluded his request by telling the court that "under the circumstances I feel that it's best for me to get my own counsel to come into this court pertaining to this matter where I would get proper representation, and that is the only way I feel I would get justice."

The court questioned defendant extensively concerning his wishes and the background of his case. Defendant revealed that after his arrest in mid-January he requested that an attorney appointed prior to Mr. Austin (defendant's trial counsel) be relieved from representing him and another attorney appointed. This request was granted. Defendant asserted that he was not this time requesting the appointment of another attorney, but only that "the court relieve this attorney of all obligation toward this case and me." In reply to the court's question as to how long defendant had known he had a right to employ an attorney of his choosing, defendant responded that he had known this "since the very beginning . . . but the fact remains that I did not have necessary funds to obtain counsel on my own, but since I've found out certain information and corresponded with certain

State v. Gray

other attorneys, I have a better opportunity now to obtain my own counsel." Thereupon the following colloquy ensued:

"COURT: How much money do you have?

MR. GRAY: It's not a matter of money. It's a matter that I have corresponded and talked to other attorneys and, you know, I could still get back in touch with them so they could take up this matter.

COURT: Are any of them here?

MR. GRAY: No, they are not.

COURT: How long have you known the case was going to be tried today?

MR. GRAY: I would say approximately three weeks, but there were certain matters involved that I mentioned that I didn't know until only recently, within a week or so."

The court also questioned defense counsel and ascertained that he was qualified, both by education and experience, including an eariler two year's service as assistant district attorney, to do criminal defense work at the superior court level. At this point defendant interrupted, reminding the court that his first court-appointed attorney had been an ex-district attorney and that another ex-district attorney had refused to take the case. He objected to the "injustice and wrong" of having had ex-district attorneys appointed for him.

[5] It is clear that defendant had no reasonable objection to his attorney's conduct or preparation of his case. His complaints are general and vague, and the emphasis of his objections shifted during the hearing. His counsel, as appears from the record, was well qualified and did, in fact, represent defendant in an exemplary fashion. Defendant's assertion that he wished to employ his own counsel, made as it was, on the day trial was to begin and without the appearance or even the name of a single attorney who might be privately employed to represent him, was no ground for the dismissal of his court-appointed counsel. Defendant did not claim he had the funds to employ counsel. There is not a scintilla of evidence indicating defendant's intention or desire to represent himself; indeed, he seems to have been more than usually aware of the critical role played by counsel in criminal trials.

**[6]**   While defendant may have been peeved with his attorney for personal reasons, the court had no reason to doubt that attorney's effectiveness and capability as an advocate or to suspect the relationship between defendant and his counsel to have deteriorated so as to prejudice the presentation of his defense. *See State v. Robinson, supra* at 66-67, 224 S.E. 2d at 179-80. Certainly, counsel's brief former tenure as an assistant district attorney constitutes no conflict of interest and yields, if anything, a greater probability that defendant would be competently represented by an attorney experienced in serious criminal trials. To have allowed the motions to remove counsel would have significantly delayed defendant's trial without the slightest demonstration of any potential benefit to his case.

### III

**[8]**   Defendant challenges on grounds of relevancy the admission of the results of certain blood grouping and absorption inhibition tests and the comparison of those results with the blood types of Mrs. Johns, the defendant, and Griffith.

The Court of Appeals has resolved the issue of the relevancy of blood grouping test results in favor of admissibility. *State v. Jacobs,* 6 N.C. App. 751, 171 S.E. 2d 21 (1969). That Court held, speaking through Judge Morris, that "[t]here is respectable authority that such testimony relating to blood test results may be admitted into evidence. 46 A.L.R. 2d 1000; McCormick on Evidence, § 177 (1954); 29 Am. Jur. 2d, Evidence, § 106." The following authorities also support the general rule of admissibility of blood grouping test results in criminal trials: *Kemp v. Government of the Canal Zone,* 167 F. 2d 938 (5th Cir. 1948); *State v. Thomas,* 78 Ariz. 52, 275 P. 2d 408 (1954), *aff'd,* 356 U.S. 390 (1958), *rev'd on other grounds in State v. Pina,* 94 Ariz. 243, 383 P. 2d 167 (1963); *Davis v. State,* 189 Md. 640, 57 A. 2d 289 (1948); *see Dockery v. State,* 269 Ala. 564, 114 So. 2d 394 (1959); *Commonwealth v. Statti,* 166 Pa. Super. Ct. 577, 73 A. 2d 688 (1950); *cf. People v. Mummert,* 57 Cal. App. 2d 849, 135 P. 2d 665 (1943), *rev'd on other grounds in People v. Collins,* 54 Cal. 2d 57, 351 P. 2d 326, 4 Cal. Rptr. 158 (1960); *State v. Alexander,* 7 N.J. 585, 83 A. 2d 441, *cert. denied,* 343 U.S. 908 (1951); *State v. Tipton,* 57 N.M. 681, 262 P. 2d 378 (1953).

While this Court has never directly decided the relevancy issue we have several times addressed questions closely associ-

ated with it. In *State v. King,* 287 N.C. 645, 215 S.E. 2d 540 (1975), *death sentence vacated,* 96 S.Ct. 3208 (1976), evidence was offered that some blood stains found on a coat at defendants' residence were group "O" and some were group "A." The victim's blood was group "O" and defendants' group "A." The Court overruled assignments of error directed to the factual basis for allowing blood samples to be drawn from defendants, to defendants' right to counsel at the time blood samples were taken and to the trial court's finding certain witnesses on the point to be experts. One of these witnesses was Brian Stemball, the state's serology expert in the case at bar. The court allowed the evidence, no error having been assigned based on its relevancy. Similar tangential issues were resolved in favor of the state in *State v. Johnson,* 280 N.C. 281, 185 S.E. 2d 698 (1972) and *State v. Peale,* 274 N.C. 106, 161 S.E. 2d 568 (1968), *cert. denied,* 393 U.S. 1042 (1969).

[7, 8]  We believe the better view to be that results of blood grouping tests are generally admissible. While their positive probative value is somewhat tenuous, we see little, if any, ascertainable prejudice which could arise from their admission. As we observed in *State v. Johnson, supra* at 287, 185 S.E. 2d at 701: "At most, analysis of hair and blood samples tended to identify the defendant as belonging to the class to which the guilty party belonged. The analysis might have indicated he did not belong to that class." Obviously the tests are highly probative negatively. Here Stemball testified that the vaginal sample of semen taken from the victim indicated the secretor thereof had type "B" or type "AB" blood. This tended to negate a possible defense contention, however weak, that the semen was deposited in perhaps a consensual sexual encounter by Griffith who had blood type "A."

Neither *People v. Robinson,* 27 N.Y. 2d 864, 265 N.E. 2d 543, 317 N.Y.S. 2d 19 (1970) (finding blood grouping test results "of no probative value" but holding their admission nonprejudicial in light of unspecified limiting instructions and "the fully adequate case made out by other proof against the defendant") nor *State v. Peterson,* 219 N.W. 2d 665 (Iowa, 1974) (holding blood samples inadmissible because seized unlawfully) is persuasive of defendant's contention that the admission of the test results here was prejudicial error. In view of the weight of other evidence against defendant we cannot

perceive how evidence of the blood grouping results could have affected the outcome of the trial.

**[9]** Defendant also argues that no proper foundation was laid for the admission of the absorption inhibition tests. The contention is that their validity and reliability were not properly established. The witness Brian Stemball, found to be an expert forensic chemist by the court, on *voir dire* testified that both Louise Johns and defendant Gray were "secretors," that is, that their blood types could be determined from body fluids other than blood. His tests established defendant as a type "B" secretor and Louise Johns as a type "A" secretor. The witness testified at length to his methodology. Over objection he testified that he found blood types "A" and "B" in a test done on a vaginal swab taken from Louise Johns and type "B" on a cigarette butt which, evidence tended to show, had been dropped in Mrs. Johns' apartment by her assailant. The witness conducted the tests himself and was carefully precise in his testimony. Under these circumstances and particularly in light of the evident similarity between the absorption inhibition tests used here and standard blood typing tests, whose reliability are not open to serious doubt, *see State v. Fowler,* 277 N.C. 305, 177 S.E. 2d 385 (1970), we hold that the reliability and validity of the tests in question were sufficiently demonstrated to render them admissible. *Cf. State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974), *death sentence vacated,* 96 S.Ct. 3205 (1976); *Coppolino v. State,* 223 So. 2d 68 (Fla. 2d Dist.), *appeal dismissed,* 234 So. 2d 120 (Fla. 1969), *cert. denied,* 399 U.S. 927 (1970).

## IV

By assignment of error numbers seven and twenty, defendant asserts error in the allowance, over objection, of lay opinion testimony regarding defendant's age and the admission into evidence of State's Exhibit # 13, a so-called "Certified Certificate of Birth." For reasons given below we find no error prejudicial to the defendant in the admission of this evidence.

In a prosecution for first degree rape under General Statute 14-21(a)(2) the state must allege in the indictment and prove that the defendant was more than sixteen years of age at the time of the alleged rape, this being an essential element of the crime. *State v. Perry,* 291 N.C. 586, 231 S.E. 2d 262 (1977). In an effort to meet this burden here the state elicited

from the victim, Robert Griffith and two police officers, all of whom had observed defendant, their respective opinions that the defendant was in his "middle to late twenties"; "twenties, mid-twenties"; "twenty-one or twenty-two"; "twenty-six or twenty-seven." The state also offered a paper writing, State's Exhibit #13, in words and figures as follows:

> "CERTIFIED CERTIFICATE OF BIRTH
>
> This certifies that the following birth occurred in Charlotte, North Carolina, and is registered in the Office of Vital Statistics, Mecklenburg County Health Department, Charlotte, North Carolina.
>
> NAME Dewey Lee Gray, Jr.
>
> DATE OF BIRTH February 17, 1947
>
> NAME OF FATHER Dewey Lee Gray, Sr.
>
> MAIDEN NAME OF MOTHER Birdie Williams
>
> This birth is recorded as Certificate No. 868
>
> Witness my hand and official seal this 18th day of June 1975
>
> DIRECTOR OF HEALTH        /s/Jacqueline Creech
> /s/Maurice Kamp, M.D.       Deputy Registrar"

The signature of Maurice Kamp, M.D., is printed as is all else except the information pertaining particularly to "Dewey Lee Gray, Jr." and the signature of Jacqueline Creech. The name Jacqueline Creech appears as an original signature. The seal of the Mecklenburg County Health Department is embossed on the document.

At trial defendant objected to introduction of State's Exhibit # 13 on the ground that the "Dewey Lee Gray, Jr.," named therein was not shown to be the defendant on trial.

Defendant was a witness on his own behalf. On cross-examination he testified in part as follows:

> "I was born and raised in Charlotte. My mother's name was Bertie Williams. Yes, my birthday is February 17, 1974.
>
> "As to whether I was in San Diego in 1967, right, in the Navy."

[11] Clearly whatever error may have been committed in the introduction of evidence of defendant's age in the state's case was rendered harmless by defendant's own testimony. While on the stand he never denied that he was more than sixteen years old. His statement about his Navy duty establishes that he must have been more than sixteen long before the alleged rape occurred. His statement that his birthday was "February 17, 1974," is obviously either a *lapsus linguae* or a typographical error whereby the seven and the four have been transposed. Defendant on direct examination testified that he was married, living with his wife, the father of two children, working regularly, and buying his own home. From defendant's own testimony the conclusion that he was more than sixteen years old, although admittedly one for the jury to draw, is simply inescapable. Furthermore the jury may base its determination of a defendant's age on its own observation of him even when the defendant does not testify. *State v. Overman,* 269 N.C. 453, 153 S.E. 2d 44 (1967), relying on 1 Stansbury's North Carolina Evidence § 119 (2d ed. 1963). *Cf. State v. McNair,* 93 N.C. 628 (1884).

While to decide this case we need not determine whether the admission of defendant's age was technical error, we deem it advisable to consider the question for the guidance of our district attorneys and defense counsel in future cases where the state will be faced with the problem of proving a defendant's age. Our conclusion is that it was proper to admit the opinion of the lay witnesses who had ample opportunity to observe and did observe defendant but that it was error to admit the so-called "Certified Certificate of Birth."

The question of the admissibility of lay opinion regarding a person's age when age is in issue is, with us, one of first impression. This Court has held that a medical expert may give his opinion as to the age of the victim of a crime. *State v. Smith,* 61 N.C. 302 (1867). It has long been established, too, that lay opinion generally is permitted in circumstances where an ordinary observer having sufficient opportunity to observe would be qualified to draw inferences helpful to the jury if the factual foundations for such inferences are difficult of formulation or explication. Examples are cases allowing lay opinion as to mental capacity, value, or identity. 1 Stansbury's North Carolina Evidence §§ 127, 128, 129 (Brandis Rev. 1973). Non-expert testimony as to a person's race has been allowed. *Hop-*

*kins v. Bowers,* 111 N.C. 175, 16 S.E. 1 (1892). "Even when it might be *possible* to describe the facts in detail, it may still be *impracticable* to do so because of the limitations of customary speech, or the relative unimportance of the subject testified about, or the difficulty in analyzing the thought processes by which the witness reaches his conclusion, or because the inference drawn is such a natural and well understood one that it would be a waste of time for him to elaborate the facts . . . . " 1 Stansbury's North Carolina Evidence § 125 (Brandis Rev. 1973). The general rule is that a competent lay observer may be permitted to state his opinion as to the age of another person. 32 C.J.S. Evidence § 546 (7).

[10] Since the age of a defendant is a fact peculiarly within his own knowledge, the state must be left some latitude within which to carry its burden of proof on this issue. We, therefore, adopt the rule that lay witnesses with an adequate opportunity to observe and who have in fact observed may state their opinion regarding the age of a defendant in a criminal case when the fact that he was at the time in question over a certain age is one of the essential elements to be proved by the state. It is important to note that the exact age of the defendant is not in issue, nor need the state prove it. It must prove only that he was at the time of the offense charged over sixteen. The rule we adopt should not be interpreted to extend to any case, criminal or civil, where the *exact* age of someone must be proved.

Regarding the so-called "Certificate of Birth" it is obvious that, again due to defendant's own testimony, the ground stated by defendant at trial for his objection is feckless. He testified that his mother was named Bertie Williams. State's Exhibit # 13 listed the mother of the person whose date of birth was given as "Birdie Williams."

[11] It would have been, however, a proper ground of objection that State's Exhibit # 13 is not really a certified *copy* of any official record so as to be admissible under General Statutes 130-66; 8-34; or 8-35. The exhibit, while labeled a "Certified Certificate of Birth," purports to be an original document which, over the signature of a "Deputy Registrar" merely summarizes certain information which is apparently recorded in the Office of Vital Statistics in Mecklenburg County on Birth Certificate No. 868. Thus State's Exhibit # 13 is no more than the Deputy Registrar's assertion of what she found on the recorded

birth certificate. As such it was double hearsay and inadmissible.

General Statute 130-66 (b) provides:

> "The State Registrar is authorized to prepare typewritten, photographic, or other reproductions of original records and files in his office. Such reproductions, when certified by him, shall be considered for all purposes the same as the original and shall be prima facie evidence of the facts therein stated."

The State Registrar in this same section is also given power to appoint agents with authority to issue certified *copies* of birth or death records and "to sign the name of or affix a facsimile of the signature of the State Registrar to the certification of said copy; and any copy of a record of a birth or a death, with the certification of same, so signed or with the facsimile of the State Registrar fixed thereto shall have the same evidentiary value as those issued by the State Registrar." Not only does State's Exhibit # 13 not purport to be a certified copy of an official birth certificate, there is no showing that it was certified by the State Registrar or an authorized agent thereof.

The admission, consequently, of State's Exhibit # 13 was technically error but not, under the circumstances, prejudicial to this defendant. *Cf. State v. Watson,* 281 N.C. 221, 188 S.E. 2d 289 (1972).

## V

[12] We now discuss seriatim other less substantial contentions of defendant. Defendant assigns as error the denial of his pretrial motion to be mentally examined to determine his capacity to stand trial. Defendant concedes that under General Statute 122-91, in effect at the time of this trial but since repealed, this motion lay within the sound discretion of the trial court. *State v. Washington,* 283 N.C. 175, 195 S.E. 2d 534 (1973), *cert. denied,* 414 U.S. 1132 (1974). Nevertheless, he complains of the informality of the inquiry in this case. "Ordinarily, it is for the court, in its discretion, to determine whether the circumstances brought to its attention are sufficient to call for a formal inquiry to determine whether defendant has sufficient mental capacity to plead to the indictment and conduct a rational defense." *State v. Propst,* 274 N.C. 62, 68, 161 S.E. 2d 560, 565 (1968).

State v. Gray

The question of defendant's competency to stand trial was raised in this case at the end of the hearing conducted on defendant's motion to dismiss his counsel, discussed *ante*. During the process of that hearing, the court inquired concerning the alleged breakdown of communications between defendant and his attorney and questioned defendant as to whether he had ever been treated by or consulted with a psychologist or psychiatrist or been confined to a mental institution. Defendant answered negatively. At that point defendant and his attorney conferred out of the courtroom. Upon returning to the courtroom, defense counsel moved to have defendant mentally examined "to determine whether or not he is, by reason of mental illness, capable of assisting in the preparation of his defense, and also to determine the question of whether or not he understands the charges against him . . . . " To the court's invitation for evidence on that question, defense counsel replied that his evidence was "his inability to communicate" with defendant for the preceding week or ten days. Counsel concluded "I'm not a psychologist or psychiatrist so I can only speculate, but the reason may very well be mental illness." This conclusion, he said, was induced by the failure of defendant's apprehension of the seriousness of the charge against him to inspire any effective communication. Counsel specifically stated he had no other evidence to present. At that time, defendant interrupted to inform the court that the reason for the lack of communication lay in his attorney's failure to come to see him for a week accompanied by counsel's urging that defendant plead guilty to first degree burglary. We see nothing amiss in the procedure utilized by the court in hearing and ruling on this question. We find nothing in the record to indicate defendant's incapacity to stand trial; indeed he seems to have been more than usually adept at that task. His lengthy personal argument to the court on other pre-trial motions demonstrates his understanding and powers of articulation concerning the charges against him. The motion for a pre-trial mental examination was a mere afterthought totally lacking in substance. This assignment is overruled.

[13, 14] Defendant assigns as error the admission of Louise Johns' and Robert Griffith's in-court identification. He contends that the pre-trial photographic identification procedures were unnecessarily suggestive because of the nature of the photographs. We have examined the photographs and find nothing to indicate impermissible suggestiveness. Defendant's hairdo,

though different from others in the stack of photographs, was not the basis for either identification. Testimony revealed the assailant wore a hat. Nor is there any evidence to suggest that Louise Johns' identification of defendant at the preliminary hearing, where he was the only black male in the courtroom, had any effect on her identification at trial.

[15] The trial court held *voir dire* examinations before admitting Louise Johns' and Robert Griffith's testimony identifying defendant as the assailant. Each time, the court found facts, fully supported by testimony given during *voir dire*, that the witnesses had extensive opportunity to view defendant in good lighting and in close proximity at the time of the crime. The court's conclusions, properly supported by these findings of fact, were that none of the pre-trial identification procedures were impermissibly suggestive and that the in-court identifications of defendant by witnesses Johns and Griffith arose independently, from adequate observation at the time of the crime, and were not tainted by any pre-trial conduct of any law enforcement officer or court personnel.

These assignments are overruled. *State v. Woods,* 286 N.C. 612, 213 S.E. 2d 214 (1975), *death sentence vacated,* 96 S.Ct. 3207 (1976) ; *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884 (1974) ; *State v. Mems,* 281 N.C. 658, 190 S.E. 2d 164 (1972).

[16] Defendant next contends his constitutional rights to confrontation, counsel, due process, and equal protection were violated by denial of his pre-trial motion to undergo a polygraph examination. There is no merit to this contention. The results of a polygraph examination are inadmissible in evidence. *State v. Brunson,* 287 N.C. 436, 215 S.E. 2d 94 (1975) ; *State v. Foye,* 254 N.C. 704, 120 S.E. 2d 169 (1961). In addition, defendant's argument is considerably undermined by his refusal of the state's offer to administer a polygraph examination on condition that defendant as well as the state stipulate the admissibility of the results. Such an examination was, therefore, irrelevant to the case and unnecessary to the presentation of an effective defense.

[17] Defendant objects to the admission into evidence of a black and white tweed three-quarter length coat with a fur collar, which closely matched the description Mrs. Johns gave police of the coat worn by her assailant as well as descriptions offered by other witnesses. The day after defendant's arrest,

State v. Gray

the coat was seized from his home pursuant to a search warrant. The affidavit upon which the warrant was issued contained Mrs. Johns' description of the coat as a "brown three-quarter length coat with fur collar." The coat is unquestionably relevant and was properly admitted. *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384 (1972). The variance in description and actuality of the color of the coat is easily explained by the darkness and the rain on the night of the crime. Under such conditions it would be easy to mistake a black and white tweed for brown. This discrepancy affects the weight but not the admissibility of the evidence. The description in the warrant was sufficiently precise to preclude any doubt that the coat seized was the one authorized to be taken. Since the warrant was adequately descriptive to prevent a roving or exploratory search, there is no merit to defendant's objection to the warrant. *State v. Foye,* 14 N.C. App. 200, 188 S.E. 2d 67 (1972); *United States v. Scharfman,* 448 F. 2d 1352 (2d Cir. 1971), *cert. denied,* 405 U.S. 919 (1972); *James v. United States,* 416 F. 2d 467 (5th Cir. 1969), *cert. denied,* 397 U.S. 907 (1970). Neither must the coat be excluded, as defendant contends, as "the fruit of a poisonous tree." The trial court found on *voir dire* that the coat was legally and properly obtained pursuant to a valid search warrant. There is no evidence whatever in the record that the seizure of the coat originated from an illegal search at the time of arrest, as defendant contends. This assignment is overruled.

[18] Defendant's contention that nonsuit should have been granted as to first degree rape because there was no evidence that the victim's resistance was overcome or her submission procured through the use of a deadly weapon is wholly without merit. Defendant argues there is not substantial evidence that the use of the gun he carried caused Louise Johns to submit, and that the term "use" in General Statute 14-21 means more than "possess." "[A] deadly weapon is used to procure the subjugation or submission of a rape victim within the meaning of G.S. 14-21(a)(2) when (1) it is exhibited to her and the defendant verbally, by brandishment or otherwise, threatens to use it; (2) the victim knows, or reasonably believes, that the weapon remains in the possession of her attacker or readily accessible to him; and (3) she submits or terminates her resistance because of her fear that if she does not he will kill or injure her with the weapon. In other words, the deadly

weapon is used, not only when the attacker overcomes the rape victim's resistance or obtains her submission by its actual functional use as a weapon, but also by his threatened use of it when the victim knows, or reasonably believes, that the weapon is readily accessible to her attacker or that he commands its immediate use." *State v. Thompson,* 290 N.C. 431, 444, 226 S.E. 2d 487, 494-95 (1976); *accord, State v. Dull,* 289 N.C. 55, 220 S.E. 2d 344 (1975), *death sentence vacated,* 96 S.Ct. 3211 (1976).

Both Mrs. Johns and Griffith testified that defendant carried a gun with a "very long barrel" in full view and waved it in his hands and that Mrs. Johns told Griffith, "Run. He has a gun," then returned into her apartment, locked the door and called police. Mrs. Johns testified defendant kicked the door in, discovered her hiding place and dragged her out of the apartment into the field behind to rape her, again brandishing the gun in one hand.

Not only is this evidence fully sufficient to permit a reasonable inference that Mrs. Johns' submission was procured by the use of a deadly weapon, it would permit no other reasonable inference.

[19] Defendant urges that there is a fatal variance between the allegations in the indictment and the proof. The indictment charges that the prosecuting witness had her resistance overcome or her submission procured "by the use of a deadly weapon and by the infliction of serious bodily injury . . . . " General Statute 14-21 (a) (2) provides: "[A]nd the rape victim had her resistance overcome or her submission procured by the use of a deadly weapon, or by the infliciton of serious bodily injury . . . . " We considered a similar issue concerning General Statute 14-87 in *State v. Swaney,* 277 N.C. 602, 611, 178 S.E. 2d 399, 405, *appeal dismissed,* 402 U.S. 1006 (1971). We held there, " 'Where a statute sets forth disjunctively several means or ways by which the offense may be committed, a warrant thereunder correctly charges them conjunctively.' 4 Strong's N. C. Index 2d, Indictment and Warrant § 9, p. 353; *State v. Chestnutt,* 241 N.C. 401, 85 S.E. 2d 297." The indictment correctly charged the offense of first degree rape.

All of the evidence pointed to the procurance of Mrs. Johns' submission by the use of a deadly weapon, i.e., a gun. The stabbing, as the state's evidence shows, took place after the act of

intercourse. There is no evidence that serious bodily injury occurred to the victim prior to the act of intercourse.

The court submitted the issue of first degree rape to the jury solely on the theory, supported by the evidence, that the prosecuting witness' submission was procured by the use of a deadly weapon. There was thus no error prejudicial to defendant in the inclusion of the "serious bodily injury" theory of the crime in the indictment. *See State v. Shields,* 14 N.C. App. 650, 188 S.E. 2d 641 (1972) ; *cf. State v. Adams,* 266 N.C. 406, 146 S.E. 2d 505 (1966) ; *State v. Mundy,* 243 N.C. 149, 90 S.E. 2d 312 (1955).

[20]  Where an indictment sets forth conjunctively two means by which the crime charged may have been committed, there is no fatal variance between indictment and proof when the state offers evidence supporting only one of the means charged. *See State v. Brown,* 266 N.C. 55, 145 S.E. 2d 297 (1965), *rev'd on other grounds in State v. Jones,* 275 N.C. 432, 168 S.E. 2d 380 (1969) and *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 174 (1971) ; *State v. Best,* 232 N.C. 575, 61 S.E. 2d 612 (1950) ; *State v. Mumford,* 227 N.C. 132, 41 S.E. 2d 201 (1947).

Defendant assigns error directed to the court's failure to submit an issue of second degree rape to the jury. Defendant presented an alibi defense. He concedes that if the Court finds sufficient evidence of first degree rape to withstand motion for nonsuit, this assignment is of no merit. We find no evidence in the record to support a verdict of. guilty of second degree rape. This assignment is overruled. *State v. Harris,* 290 N.C. 681, 228 S.E. 2d 437 (1976) ; *State v. Woods, supra.*

We have closely examined the record and have considered all defendant's remaining assignments of error. No purpose is served by our discussing them. They are obviously without merit. Since there is no error in this record which would require a new trial, we may not disturb the verdict of the jury.

[21]  However,·under *Woodson v. North Carolina,* 428 U.S. 280 (1976) the judgment of the superior court sentencing defendant to death must be vacated. *State v. Montgomery,* 291 N.C. 91, *supra.* So that a sentence of life imprisonment in Case No. 75-CR-2774 may be substituted under the authority of 1973 Session Laws, Ch. 1201, § 7 (1974 Session), we remand this case to the Superior Court of Mecklenburg County with direc-

tions (1) that the presiding judge, without requiring the presence of defendant, enter a judgment in Case No. 75-CR-2774 imposing life imprisonment for the first degree rape of which defendant has been convicted; and (2) that in accordance with this judgment, the Clerk of the Superior Court issue a commitment in substitution for the commitment heretofore issued. It is further ordered that the Clerk of Superior Court furnish to defendant and his counsel a copy of the judgment and commitment as revised in accordance with this opinion.

In Case No. 75-CR-2774—No error in the verdict;
Death sentence vacated.

In Case No. 75-CR-2775—No error.

In Case No. 75-CR-2776—No error.