STATE OF NORTH CAROLINA v. ROBERT LEE KNIGHT

No. 12

(Filed 15 November 1972)

1. Criminal Law § 66— pretrial identification — suggestiveness — likelihood of irreparable misidentification

    Conviction based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

State v. Knight

2. **Criminal Law § 66— pretrial photographic identification — in-court identification — independent origin**

   Though the pretrial photographic identification procedure used in a first degree burglary case was impermissibly suggestive since the photographic showing was of only one picture and was accompanied by the statement of police, "we've got a man, is this the one," the victim's in-court identification of defendant was based on observation at the time of the offense and was of independent origin; this independent origin established the lack of a very substantial likelihood of irreparable misidentification, despite the impermissible suggestiveness of the photographic identification procedure.

3. **Criminal Law § 66— suggestive pretrial identificaton procedure — inadmissibility**

   The introduction of testimony concerning an out-of-court photographic identification must be excluded where the procedure used is impermissibly suggestive, even though that suggestiveness does not require exclusion of the in-court identification itself.

4. **Criminal Law § 169— admission of incompetent evidence — harmless error**

   Though evidence of an impermissibly suggestive pretrial identification procedure was incompetent, its admission was harmless error beyond a reasonable doubt where other competent evidence in the case overwhelmingly showed defendant guilty of first degree burglary.

5. **Criminal Law § 93— order of proof**

   Defendant cannot complain that testimony of a police officer should have been admitted, if at all, while the State was making out its case in chief, rather than as rebuttal evidence since the order of proof is a rule of practice resting in the sound discretion of the trial court, and defendant has shown no abuse of that discretion in this case.

APPEAL by defendant from Judgment of *Brewer, J.,* 1 January 1972 Session, LEE Superior Court.

Defendant was tried on a bill of indictment, sufficient in form, charging that on 6 February 1971, about the hour of 1:20 a.m. in the night of the same day, defendant broke into and entered the dwelling house of Ervin Garner, actually occupied by him, with intent to steal and carry away the goods and chattels of Ervin Garner.

The State's evidence tends to show that a little after 1 a.m. on 6 February 1971 Ervin Garner, who resided with his wife, three children and his father, at 110 Austin Street in Sanford, was awakened by his wife and told that someone was in their bedroom. It was dim in his bedroom as the drapes were drawn

and no lights were on, but there was a light burning in the bathroom which shone into the hall between the bedroom and the kitchen and reflected light into the bedroom. Mr. Garner arose and was cut with a knife by the intruder. He saw his attacker at a distance of three feet. The bathroom light was shining in his assailant's face. He chased his attacker through the house and out the rear door. About four minutes elapsed between the time he was awakened until he reentered his house. Officers were called and the rescue squad carried Mr. Garner to the hospital where, the same day about 7 p.m., he was shown a color photograph of the defendant by the chief of police and was asked if "he was the one." He immediately, "in a split second," identified his attacker as the man shown in the photograph. He was then told that defendant was in jail. This was the only photograph shown him.

Immediately after the attack, a jacket belonging to defendant with various letters addressed to defendant and other documents bearing his name was found in the Garner's bedroom and turned over to the officers. With such information in hand, the officers had arrested defendant and placed him in jail before the photograph was ever shown to Mr. Garner.

Prior to Mr. Garner's in-court identification of defendant, a voir dire was conducted in the absence of the jury, at which only the State offered evidence. Mr. Garner testified on this voir dire that when his wife awakened him he got out of bed; that it was a moonlit night and in addition there was a light burning in the bathroom which reflected into the bedroom; that for a distance of about eight or nine feet he could get "a real good view" of an object or a face in the bedroom; that when he first awoke there was a person within three feet standing over the bed; that he had never seen that person before; that the intruder was wearing black boots above the ankles and a dark turtleneck sweater pulled up about the chin; that the intruder was facing the light coming from the bathroom and he could see his face; that he was stabbed in the neck by the intruder and later taken to the hospital where, about 7 p.m. the same day, he was shown a photograph by Chief Thomas; that he recognized defendant from the picture; that on seeing the picture, "I just noticed his face. The picture had nothing to do with my identification or description of the clothing he was wearing that night"; that when he looked at the picture he recognized the man as his assailant and he learned

later that identification papers in the jacket found in the bed-room had defendant's name on them; that when he was shown the picture the officers said "we've got a man, is this the one," and "I looked at it and said yes, sir, he is the one."

The court found facts substantially in accord with Mr. Garner's testimony, there being no evidence offered to the contrary, including a finding that Mr. Garner's in-court identification of defendant was not based upon the photograph shown him at the hospital by Chief Thomas. Defendant's motion to suppress was thereupon denied, the jury returned, and Mr. Garner testified substantially to the same facts before the jury.

Mr. Garner further testified that when he went to bed on the night of the assault his pocketbook was in his pants pocket and that the pocketbook was missing the next morning and he had not seen it since.

The State offered in evidence defendant's jacket found in the bedroom, (S-5), together with the items removed from the jacket pocket which included, *inter alia*, (1) a letter addressed to Bobby Knight, Route 2, Box 325, Sanford, (2) a certified birth certificate of Robert Lee Knight and (3) a Selective Service notice of classification bearing the name of Robert Lee Knight. These items were identified as State's Exhibit 6.

When defendant was arrested about ten o'clock on the morning following the assault on Mr. Garner, he was wearing a green turtleneck sweater and a pair of dark trousers. He did not have on any shoes when the officers arrived at his residence but later put on a regular pair of lace-up shoes. The turtleneck sweater had a red stain, like blood, on the upper portion of the neck part. The sweater (S-7) and trousers (S-8) were offered in evidence.

Defendant testified as a witness in his own behalf. He stated that about 7 p.m. on 5 February 1971 he was at the home of one Jimmy Walston on Chatham Avenue in Sanford; that he and others present there drank two pints of whiskey and then purchased more from a man named Cottcamp and drank it; that he was wearing a green flight jacket, a pair of bell bottoms, a turtleneck sweater with short sleeves, a hat and a pair of western style boots; that the green sweater offered in evidence was the one he was wearing that evening and the

flight jacket offered in evidence "appears to be my flight jacket"; that the papers offered in evidence by the State were in the inside jacket pocket and the birth certificate was his; that he left Jimmy Walston's home "that night or morning" in a car driven by a boy whose name he did not know; that he didn't know where he went in the automobile due to the pills he had been taking and the whiskey he had consumed; that when he eventually realized where he was, "I was in Jonesboro on Main Street at the railroad crossing"; that he went from there to the Pay-Lo Service Station, called the police department and told them he had been rolled—"Somebody had taken my jacket and some money that I had in my pocket. . . . I last saw my jacket at Jimmy Walston's house, they had the heat up pretty high and I pulled my jacket and my hat off. I haven't ever seen my hat since."

After calling the police, defendant testified he then got with some friends and had some more drinks and went home that morning. He was then arrested and taken to the police station. He testified that he did not enter Mr. Garner's home, did not assault him and did not steal his wallet.

Defendant admitted on cross-examination that he had been convicted of driving without a license, robbery, common-law robbery, disorderly conduct, larceny, assault with a deadly weapon, carrying a concealed weapon, forcible trespass, resisting arrest, and destruction of personal property.

Officer A. W. Poe, a defense witness, testified that on 6 February 1971 at 2:20 a.m. he received a call from defendant and went to the Pay-Lo Service Station where he found defendant standing at the phone booth dressed in a green turtleneck sweater, a dark pair of trousers and a pair of boots. He was not wearing a jacket at that time. He had been drinking and had the odor of alcohol about him. The officer said he transported defendant approximately two to two and one-half miles and let him off at the city limits; that in his opinion defendant was not under the influence of whiskey at that time.

The defendant was convicted of burglary in the first degree and sentenced to life imprisonment pursuant to the jury's recommendation. Errors assigned on appeal therefrom will be noted in the opinion.

*J. W. Hoyle, Attorney for defendant appellant.*

*Robert Morgan, Attorney General, and Sidney S. Eagles, Jr., Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

Appellant's first assignment of error is based on his contention that the photographic identification procedure was so impermissibly suggestive that admission of the in-court identification violated due process of law. This contention questions the admissibility of testimony concerning the photographic identification at the hospital as well as the admissibility of Mr. Garner's in-court identification of defendant himself.

[1] In *Simmons v. United States,* 390 U.S. 377, 19 L.Ed. 2d 1247, 88 S.Ct. 967 (1968), the Court refused to prohibit absolutely the use of identification by photograph and instead held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

Factors to consider in applying the *Simmons* test are: "(1) The manner in which the pretrial identification was conducted; (2) the witness's prior opportunity to observe the alleged criminal act; (3) the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification; (4) any previous identification by the witness of some other person; (5) any previous identification of the defendant himself; (6) failure to identify the defendant on a prior occasion; and (7) the lapse of time between the alleged act and the out-of-court identification." *United States v. Zeiler,* 447 F. 2d 993 (3d Cir. 1971). *Cf. United States v. Wade,* 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926 (1967); *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534 (1970). The first of these factors focuses upon the magnitude of the suggestiveness inherent in the photographic identification procedures employed. The facts relevant to the remaining six factors are then balanced against that suggestiveness in order to determine whether, in the par-

ticular factual context under consideration, the suggestiveness gives rise "to a very substantial likelihood of irreparable misidentification." If these facts do not give rise to such likelihood, then *Simmons* does not require reversal despite the presence of "impermissible suggestiveness" in the photographic identification procedure.

[2]  With reference to the enumerated relevant factors, the evidence adduced on voir dire discloses that the pretrial photographic identification procedure used here was impermissibly suggestive since the photographic showing was of only one picture and was accompanied by the statement "we've got a man, is this the one?" If defendant's in-court identification and resulting conviction rested on that identification, it could not stand. But such is not the case. Mr. Garner had ample prior opportunity in his home to observe defendant. During the confrontation in the bedroom, he was within three feet of defendant and facing him. Light from a 50-watt bulb in the bathroom, located behind the witness, was shining into defendant's face. In addition, there was a full moon that night and there were bright yellow curtains over the bedroom windows. Also, Mr. Garner observed the defendant as he chased him through the house and out the rear door. Mr. Garner told the officers the intruder was wearing black boots above the ankles and a dark turtleneck sweater, and defendant was dressed in that fashion when first seen by Officer Poe at the Pay-Lo Service Station about 2:25 a.m. following defendant's report by telephone that he "had been rolled." Furthermore, Mr. Garner never at any time identified anyone else and promptly identified defendant by photograph and in person at the first opportunity. In light of all these circumstances, the trial judge found on voir dire "that the identification of the defendant in the courtroom was not based upon the photograph shown him at the hospital. . . ." This finding is sufficient to satisfy the *Simmons* test, even though it is not worded in the precise language used therein. *See State v. Jacobs,* 277 N.C. 151, 176 S.E. 2d 744 (1970); *State v. Accor and Moore,* 277 N.C. 65, 175 S.E. 2d 583 (1970). *Compare United States ex rel Schartner v. Pizzo,* 336 F. Supp. 1192 (M.D. Pa. 1972). The conclusion that the in-court identification was not based upon the photograph is tantamount to a conclusion that the in-court identification had an independent origin. It is this independent origin that, despite the impermissible suggestiveness of the photographic identification pro-

cedure, establishes the lack of a "very substantial likelihood of irreparable misidentification" required by *Simmons* for reversal. Therefore, the finding, being supported by competent evidence, is conclusive and must be upheld. *State v. Morris,* 279 N.C. 477, 183 S.E. 2d 634 (1971) ; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966).

The competency of the testimony concerning Mr. Garner's photographic identification of defendant is another matter. "Quite different considerations are involved as to the admission of the testimony of the . . . witnesses . . . that they identified Gilbert at the lineup. That testimony is a direct result of the illegal lineup, 'come at by exploitation of [the primary] illegality,' *Wong Sun v. United States,* 371 U.S. 471, 488. The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of counsel at the critical lineup." *Gilbert v. California,* 388 U.S. 263, 18 L.Ed. 2d 1178, 87 S.Ct. 1951 (1967).

[3] By analogy, the introduction of testimony concerning an out-of-court photographic identification must be excluded where, as here, the procedure used is impermissibly suggestive, even though that suggestiveness does not require exclusion of the in-court identification itself under the *Simmons* test. *See United States v. Fernandez,* 456 F. 2d 638, 641-42 (2d Cir. 1972). *Compare Foster v. California,* 394 U.S. 440, 22 L.Ed. 2d 402, 89 S.Ct. 1127 (1969).

[4] In the factual context of this case, although the showing of only one photograph to the victim accompanied by the statement "we've got a man, is this the one" was impermissibly suggestive and evidence thereof incompetent, we hold its admission was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967) ; *State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970). The unequivocal in-court identification of defendant by Mr. Garner, the presence of defendant's jacket in Mr. Garner's bedroom containing a letter addressed to the defendant, a certified birth certificate of defendant, and a Selective Service notice of classification bearing defendant's name, and the fact that the description of defendant's clothing given by Mr. Garner to the

police was substantially similar to the actual clothing defendant was wearing when seen by Officer Poe about one hour after the burglary, constitutes evidence of guilt so overwhelming that, in our opinion, the impact of the photographic identification on the minds of the jurors was insignificant. Unless there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction, its admission constitutes harmless error. *Fahy v. Connecticut*, 375 U.S. 85, 11 L.Ed. 2d 171, 84 S.Ct. 229 (1963); *State v. Taylor*, 280 N.C. 273, 185 S.E. 2d 677 (1972); *State v. Smith*, 278 N.C. 476, 180 S.E. 2d 7 (1971). No such possibility arises on the evidence here. "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of [the improperly admitted evidence] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the [incompetent evidence] was harmless error." *Schneble v. Florida*, 405 U.S. 427, 31 L.Ed. 2d 340, 92 S.Ct. 1056 (1972). *See also, Harrington v. California*, 395 U.S. 250, 23 L.Ed. 2d 284, 89 S.Ct. 1726 (1969); *State v. Swaney*, 277 N.C. 602, 178 S.E. 2d 399 (1971).

Defendant's first assignment of error is overruled.

[5] Following defendant's testimony, the State was permitted, over defendant's objection, to examine Officer Mason as a rebuttal witness. This officer testified that he and Detective Boyce examined the area surrounding the Garner residence and observed footprints leading from the house. "[T]hey were a narrow pigeon-toed shoe. They came from the back of the house around the west side and to the north in the direction of Austin down to Third, we found them again on Third Street, we lost them some few feet and picked them up again. We tracked those tracks on Third Street in two or three different areas in the direction of Sanford Tobacco Company Storage Warehouses, we picked up a similar track and it proceeded to a creek, across the creek on an iron pipe, picked it up on the other side of the creek and proceeded to the railroad tracks and lost them again. The railroad tracks lead to Jonesboro. . . . From the point where we last saw the pointed foot tracks from the Pay-Lo Station in Jonesboro is between a quarter and a half a mile." Officer Mason said these footprints were "similar" to Defendant's Exhibit 1, the boots defendant had on when Officer Poe saw him at the Pay-Lo Service Station about one

hour after the burglary was committed. They were muddy at that time. Defendant contends this evidence should have been offered by the State, if at all, while making out its case in chief and should not have been admitted as rebuttal evidence. This is the basis for defendant's second assignment of error.

In our opinion Officer Mason's testimony may properly be considered as rebuttal evidence. Defendant's testimony makes it so. He said he was elsewhere when the crime was committed and had never been in Mr. Garner's residence. Yet the footprints leading from the Garner residence were "similar" to the boots defendant was wearing one hour after the burglary, and the boots were muddy. The tracks traversed muddy ground and were followed to a point at the railroad near the Pay-Lo Service Station where defendant made his telephone call. Obviously this tends to rebut defendant's evidence.

But if it be conceded *arguendo* that Officer Mason's testimony would have been properly admissible on the State's case in chief, it was not error to admit it on rebuttal. The order of proof is a rule of practice resting in the sound discretion of the trial court. *State v. Thomas,* 244 N.C. 212, 93 S.E. 2d 63 (1956). "The court, to attain the ends of justice, may in its discretion allow the examination of witnesses at any stage of the trial." *State v. King,* 84 N.C. 737 (1881). The following quotation from American Jurisprudence accurately states the majority rule: "While as a general proposition evidence offered by the prosecution in rebuttal in a criminal case must relate directly to the subject matter of the defense and ought not to consist of new matter unconnected with the defense and not tending to controvert or dispute it, this principle is intended to promote and not to defeat justice, and it is accordingly held by the great weight of authority that the admission in a criminal prosecution of evidence as a part of the rebuttal, when such evidence would have been properly admissible in chief, rests in the sound discretion of the trial judge and will not be interfered with in the absence of gross abuse of that discretion." 53 Am. Jur., Trial, § 129. *Accord,* 88 C.J.S., Trial, § 102. *Compare State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336 (1972).

Defendant's second assignment has no merit and is overruled.

Defendant's remaining assignments relate to inconsequential matters in the charge of the court, *e.g.*, referring to the occupancy of the house "by the Garners" instead of by "Ervin Garner" as alleged in the bill of indictment, and one isolated instance when the court failed to repeat the expression "beyond a reasonable doubt," although the jury had been fully instructed on the quantum of proof. A review of these assignments impels the conclusion that the matters complained of were not prejudicial. Discussion of them is not warranted.

Defendant having failed to show prejudicial error, the verdict and judgment must be upheld.

No error.