STATE OF NORTH CAROLINA v. THOMAS BRADY

No. 31

(Filed 1 April 1980)

1. **Constitutional Law § 50— speedy trial—compliance with statute**

   The State complied with the provisions of G.S. 15A-701(a1) where defendant's trial began within 120 days from the date defendant was indicted.

2. **Constitutional Law § 50— speedy trial—prejudice—pregnancy of prosecutrix**

   A defendant charged with rape, kidnapping and burglary was not prejudiced by the delay between his arrest and trial because the married prosecutrix was five months pregnant at the time of the trial where the court found that her pregnancy was not noticeable, and the State agreed not to mention her pregnancy during the trial.

3. **Jury § 7.6— challenge of juror after impanelment**

   The trial court had the discretion to permit further examination and challenge of a juror by the State after the jury was impaneled when the juror indicated that he was employed by and worked closely with defendant's brother.

4. **Criminal Law § 66.9— in-court identification—discrepancies in descriptions— photographic identification**

   A rape victim's in-court identification of defendant was not rendered inadmissible by discrepancies between her identification testimony at trial and the description of defendant previously given to investigating officers or by a pretrial photographic identification where there was nothing in the record to indicate that the collection of photographs or the manner in which they were exhibited to the prosecutrix was "impermissibly suggestive" or unduly influenced her selection of defendant's photograph; the evidence on *voir dire* showed that the prosecutrix had ample opportunity to observe defendant at the time of the rape and on two subsequent occasions when she saw him at a restaurant and at a furniture store and indicated little likelihood of mistaken identification; and the trial court concluded that the in-court identification was completely independent of the photographic identification and was not influenced in any way by the actions of the State or its officers.

5. **Criminal Law § 66.18— challenge to in-court identification—necessity for objection**

   A defendant cannot challenge an in-court identification without at least a timely general objection.

6. **Criminal Law §§ 43, 66.8— photographs—authentication—admission to illustrate identification testimony**

   Two photographs were sufficiently authenticated and were properly admitted to illustrate a rape victim's identification testimony where the evidence showed the photographs were taken in a detective's office upon defendant's arrest, and the victim stated that the first photograph was a fair and accurate

State v. Brady

representation of her assailant and identified the tattoo of a skeleton shown on the second photograph as a fair and accurate representation of the one she saw on her assailant.

**7. Rape § 5— submission procured by use of deadly weapon—sufficiency of evidence**

The State's evidence was sufficient for the jury to find that a rape victim's submission was procured by the use of a deadly weapon and that defendant was thus guilty of first degree rape where it tended to show that defendant had a hunting knife with him when he was in the victim's bedroom and when he actually raped her there, and that defendant told the victim he would not hurt her if she would do what he wanted to do.

**8. Criminal Law § 50; Rape § 4— opinion that there was insufficient evidence for warrant—testimony on question of law**

The trial court in a rape case properly struck an officer's testimony that he told the prosecutrix on a certain date that in his opinion there was insufficient evidence to proceed with a warrant at that time, since the officer was expressing an opinion on a question of law.

**9. Criminal Law § 99.7— warning to witness—no prejudicial expression of opinion**

The trial court's warning to an officer who testified for defendant, "Mr. Buheller, you are not excused from this Court. I'm sorry, but that is a clear violation of the Court's order. It has nothing to do—it doesn't express any opinion concerning his testimony. . . . I will remind him of the order of the Court," did not constitute a prejudicial comment on the witness's credibility in light of the circumstances and the court's own corrective statements both at the time and later in the charge to the jury.

**10. Burglary and Unlawful Breakings § 6— first degree burglary—omission of occupancy requirement in one portion of the charge**

In a prosecution for first degree burglary, defendant was not prejudiced when the trial judge in one portion of the charge inadvertently omitted the requirement that the house be occupied at the time of the breaking and entering where, immediately before and after the portion complained of, he included this element in both his initial definition of the crime and in his final charge.

**11. Kidnapping § 1.3— instructions on statutory mitigating circumstances—error favorable to defendant**

The trial court in a kidnapping prosecution erred in including in the charge the mitigating circumstances relating to punishment as set forth in G.S. 14-39(b), since those factors do not constitute an essential element of the offense of kidnapping and it is for the trial judge to determine their existence or nonexistence from the evidence presented at trial, at a sentencing hearing pursuant to G.S. 15A-1334 or at both proceedings; however, since the inclusion of such factors in the charge obviously placed an added burden upon the State, the error was favorable to defendant.

**12. Burglary and Unlawful Breakings § 8; Criminal Law § 26.5; Rape § 7— separate sentences for first degree burglary and rape**

The imposition of separate life sentences on defendant for the crimes of first degree burglary and rape did not constitute multiple punishments for the same offense in violation of the double jeopardy clause since the State was not

required to prove the charge of rape in order to convict defendant of burglary but was only required to prove that the purpose of the breaking and entering was to commit the designated crime of rape, and defendant committed two separate and distinct crimes when he proceeded to rape the victim after committing the burglary.

APPEAL by defendant from *Hairston, J.*, at 14 May 1979 Session of RANDOLPH Superior Court.

Defendant was charged in separate bills of indictment with the first-degree rape of Deborah Trogdon on 23 August 1978, first-degree burglary and the first-degree rape and kidnapping of Deborah Trogdon on 23 November 1978. Defendant entered a plea of not guilty to each charge, and the cases were consolidated for trial.

The State's evidence tended to show that late in the afternoon on 23 August 1978, Deborah Trogdon, the prosecuting witness, was driving to her mother-in-law's home to pick up her small son. Suddenly, a dark blue, four-door automobile pulled out in front of her, forcing her to stop. Two men stepped out of the car. The man whom Mrs. Trogdon later identified as defendant walked over to her open car window and at knife point forced her out of the car. The other man pulled her jacket over her head, and she was led to the other car and placed in the back seat.

A third man started the motor. By this time her jacket was partially off her head, and she could see defendant again. She screamed and attempted to resist defendant, and the second man climbed into the back seat and held her wrists. Defendant was holding a knife. He then removed Mrs. Trogdon's pants and penetrated her vagina with his penis. She was returned to her car and was told to sit there and not to move. She was found near her car by James Paul Trogdon, her husband's uncle, who took her to Randolph Hospital in Asheboro. There, she refused a pelvic examination because she did not wish to remove her clothes in a room with four men. She reported the rape on that day and described her assailant to Detective John Buheller of the Randolph County Sheriff's Department.

On 1 September 1978, Mrs. Trogdon was eating at a restaurant in Asheboro when she saw defendant enter the restaurant. She recognized him as the man who had assaulted her

a week earlier and reported this to the Sheriff's Department. However, she was told that she would have to press charges because the Department was not prepared to do so at that time. On 11 September 1978, she was working as a bookkeeper at Kimbrell's furniture store when she again saw defendant, who had come to the store to pay on his wife's account. At this time, she was able to obtain defendant's name for the first time. She called the Sheriff's Department after he had left and spoke with Detective Buheller.

On Thanksgiving Day, 23 November 1978, Mrs. Trogdon went to bed after her husband had left for work on a night shift. Soon thereafter she saw a flashlight in her darkened bedroom, and a person wearing a black ski mask came into the room. He told her that if he was going to be blamed for it, he was going to do it. He had a hunting knife. He dropped his pants, and when she started toward the other side of the bed, he told her that if she would do what he wanted to do he would not hurt her. He removed her underpants and inserted his penis in her vagina. She resisted but did not cry out in fear of waking her sleeping son in the next room. She was able to see a tattoo under his right eye and to recognize defendant's voice.

A second man, dressed in dark clothing and also wearing a ski mask, then came to the bedroom door and asked defendant what was taking so long. Defendant asked him if he had the stuff, and the second man answered in the affirmative. Defendant then put his pants on and held Mrs. Trogdon's arms down by her side while the second man painted her face and arms with white paint. Then they took her out of the house and put her into a car, and defendant got into the back seat with her. The car was the same one she had been forced into on 23 August. The two men drove down a rural road, stopped the car and forced her out into the woods where they laid her on the ground. There, they tore off part of her nightgown, and one of the men painted the letters "TB" across her chest and painted her private parts. She was released at a point about a mile from her home. Mrs. Trogdon ran to the house of her next-door neighbor, Brenda Small, and asked her to call the police. The police took Mrs. Trogdon to the hospital, where she was interviewed by Detective Charles Bulla of the Asheboro Police Department.

Detective Bulla spoke with Mrs. Trogdon again later in the day on 24 November 1978. He also went to her home and found that a small window in the back door had been broken.

Defendant offered the testimony of Detective Buheller who stated that he talked with Mrs. Trogdon on 23 August and at that time obtained a description of her assailant. On 1 September he showed her a series of photographs, and she did not identify any of them as being of her assailant. He talked to her again on 11 September and subsequently showed her a second series of photographs which included a picture of defendant. Mrs. Trogdon identified defendant's photograph as that of her assailant. Although defendant has a tattooed star near his right eye, Mrs. Trogdon initially could not identify any distinguishing characteristics except for facial hair and some kind of mark on his face.

Defendant also offered the testimony of Edward Rich, who as an alibi witness stated that on the evening of 23 November 1978, he left his mother's home at about 9:00 and drove to defendant's house, where he remained with defendant and his wife until approximately 10:55 p.m.

Defendant testified in his own behalf and stated that he had no independent recollection of where he was on 23 August 1978, and that he did not know Deborah Trogdon. He further testified that on the evening of 23 November, he and his wife were visited by Ed Rich, and that he remained at home after Mr. Rich had left. Defendant stated that he owns a blue and white 1966 Volkswagen and a 1969 Chevrolet pickup.

While the jury was deliberating, defendant fled. In the presence of defense counsel and in defendant's absence, the jury returned verdicts of guilty of two counts of first-degree rape, one of first-degree burglary and one of kidnapping. After the verdict was rendered on 17 May 1979, no judgment was entered pending the arrest of defendant. Defendant was placed into custody in Manassas, Virginia, on 25 July 1979. At a one-day special session of Randolph County Superior Court held on 27 July 1979 before Judge Davis, defendant was sentenced to two minimum and maximum terms of life imprisonment, to run consecutively, on the counts of first-degree rape occurring on 23 August 1978 and of first-degree burglary, and on the counts of first-degree rape and

kidnapping occurring 23 November 1978. Defendant appealed to this Court as a matter of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Christopher P. Brewer, Associate Attorney, for the State.*

*Seawell, Robbins, May & Webb, by P. Wayne Robbins, for defendant appellant.*

BRANCH, Chief Justice.

[1] Defendant first contends that the trial court erred in not dismissing the indictments against defendant for failure to comply with the provisions of G.S. 15A-701(a1) and by reason of the denial of defendant's constitutional right to a speedy trial.

The applicable language of G.S. 15A-701 provides:

(a1) Notwithstanding the provisions of G.S. 15A-701(a) the trial of a defendant charged with a criminal offense who is arrested, served with criminal process, waives an indictment or is indicted, on or after October 1, 1978, and before October 1, 1980, shall begin within the time limits specified below:

(1) Within 120 days from the date the defendant is arrested, served with criminal process, waives an indictment, or is indicted, *whichever occurs last* . . . . [Emphasis added.]

In this case, the last occurrence from which the statutory time limit could be counted was 9 April 1979, the day on which defendant was indicted. His trial began on 14 May 1979, which was well within the statutory limit.

[2] Defendant's contention that he was denied his constitutional right to a speedy trial is also without merit.

The constitutional right to a speedy trial protects an accused from extended pretrial imprisonment, from public suspicion generated by an untried accusation, from loss of witnesses and from the occurrence of other things which might prejudice his trial as a result of the delay. *State v. Spencer*, 281 N.C. 121, 187 S.E. 2d 779 (1972); *State v. Harrell*, 281 N.C. 111, 187 S.E. 2d 789 (1972). The accused has the burden of showing that the delay com-

plained of was caused by the State's willfulness or neglect. *State v. Spencer, supra; State v. Ball,* 277 N.C. 714, 178 S.E. 2d 377 (1971).

In the instant case, the only factor shown by defendant to support his motion was that the married prosecuting witness was about five months pregnant. In denying defendant's motion, the trial judge stated:

Let the record show that the Court by its own observation determines that the State's witness who has been exhibited to the Court does not show whether she is or is not pregnant and is not a visible thing with the State having agreed not to mention this during the trial and the State's witness having agreed not to mention this during the trial, the motion is denied on the basis that there is no prejudice shown. I just can't say that I think she looks like she is pregnant.

In view of these circumstances, we hold that the delay of which defendant complains did not violate his constitutional right to a speedy trial.

[3] Defendant contends that the trial court erred in excusing a juror after the jury was originally impaneled. We disagree.

After the jury had been impaneled and the trial had begun, a juror, Mr. Hayes, indicated that he was employed by and worked closely with defendant's brother. After a *voir dire* was conducted, the State challenged juror Hayes and the court excused him from the panel. An alternate juror was seated to replace Mr. Hayes. At the time, defendant stated that he had no objection.

This Court considered the question presented here in *State v. Kirkman,* 293 N.C. 447, 238 S.E. 2d 456 (1977). In that case, the Court held that the trial judge did not commit reversible error by permitting further examination and challenge of a juror by the State after the jury was impaneled, when it was discovered that the juror worked with the wife of one of the defendants. In so holding the Court, speaking through Lake, J., stated:

It is well established that, prior to the impaneling of the jury, it is within the discretion of the trial judge to reopen the examination of a juror, previously passed by both the State and the defendant, and to excuse such juror upon

challenge, either peremptory or for cause. *State v. Bowden*, 290 N.C. 702, 228 S.E. 2d 414 (1976); *State v. Harris*, 290 N.C. 681, 228 S.E. 2d 437 (1976); *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, death sentence vacated, 429 U.S. 912 (1976); *State v. Harris*, 283 N.C. 46, 194 S.E. 2d 796, *cert. den.*, 414 U.S. 850 (1973).

> In the foregoing cases, we held that G.S. 9-21(b) providing that the State's challenge, whether peremptory or for cause, must be made before the juror is tendered to the defendant "does not deprive the trial judge of his power to closely regulate and supervise the selection of the jury to the end that both the defendant and the State may receive a fair trial before an impartial jury." *State v. McKenna, supra*, at 679. In all the foregoing cases, the challenge in question was allowed before the jury was impaneled. We perceive no reason for the termination of this discretion in the trial judge at the impanelment of the jury. This assignment of error is overruled.

*Id.* at 453-54, 238 S.E. 2d at 460.

**[4]**  Defendant assigns as error the trial court's denial of defendant's motion to suppress the in-court identification of defendant by Mrs. Trogdon. Defendant notes certain discrepancies between the prosecuting witness's identification testimony at trial and the description of her assailant previously given to investigating officers. He also contends that the pretrial photographic displays were so impermissibly suggestive that her in-court identification of defendant was rendered inadmissible.

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1968), the United States Supreme Court, in expressly approving photographic identifications, set forth the following standard for determining whether an in-court identification following an allegedly suggestive pretrial identification procedure satisfies the demands of due process:

> [E]ach must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was

so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 384, 88 S.Ct. at 971, 19 L.Ed. 2d at 1253. *See also State v. Long,* 293 N.C. 286, 237 S.E. 2d 728 (1977); *State v. Knight,* 282 N.C. 220, 192 S.E. 2d 283 (1972).

In the instant case, the trial judge conducted an extensive *voir dire* hearing on the admissibility of the in-court identification of defendant by the prosecuting witness. Mrs. Trogdon testified on *voir dire* that after she had seen defendant at the restaurant on 1 September, Detective Buheller showed her between twenty-five and forty photographs of different men, the majority of whom were white and between eighteen and thirty years of age. She did not recognize any of these photographs as being of her assailant. After she had again seen defendant at Kimbrell's on 11 September, Mrs. Trogdon called Detective Buheller. He showed her between twenty-five and fifty photographs, which were the same as those shown previously except that more photographs had been added. Once again, most of the photographs were of white men. Mrs. Trogdon testified on cross-examination that "[s]ome had scars, some had short hair, some had long hair, some had tee shirts on." She immediately recognized a photograph of defendant as that of her assailant. She stated that this photograph was the same type as the other photographs. Moreover, there is absolutely nothing in the record to indicate that the collection of photographs or the manner in which they were exhibited to the prosecuting witness was "impermissibly suggestive" or unduly influenced her selection of defendant's photograph.

The United States Supreme Court in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed. 2d 401 (1972), delineated certain factors to be considered in evaluating the likelihood of misidentification. These include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200, 93 S.Ct. at 382, 34 L.Ed. 2d at 411. The court must determine in this manner whether under the "totality of the circumstances" the identification was reliable even in cases where the confrontation procedure may have been suggestive. *Id.*

A review of the testimony of Mrs. Trogdon in light of these factors indicates little likelihood of mistaken identification here. Mrs. Trogdon testified on *voir dire* that she first saw defendant on 23 August when he left his automobile and approached the driver's side of her car. She had never seen him before. The time was between 5:30 and 5:45 in the afternoon, and it was still daylight. Through her open car window, she observed him from a distance of about four or five feet for three or four minutes. After defendant had taken her out of her car and forced her into the back seat of the other automobile, she was able to observe his face again at close range for several minutes during the alleged rape. She later described her assailant to the officers as being between five and six feet tall, with long brown hair and wearing a full beard. She stated that he had something peculiar about his face or eyes, but that she could not recall exactly what it was.

Mrs. Trogdon again saw defendant on 1 September in a restaurant in Asheboro between 5:30 and 6:00 p.m. The lighting in the restaurant was very bright, and it was still daylight outside. She was able to observe his face for about five minutes from a distance of about fifteen or twenty feet away. She recognized him as her assailant and notified Detective Buheller. At this point, she described the man as having long hair, a beard and a moustache, a star tattoo under his eye and tattoos on his arms.

On 11 September Mrs. Trogdon was working at Kimbrell's when defendant entered the store at about 4:30 p.m. She was able to observe him for between ten and fifteen minutes from a distance of about five or six feet in good lighting. As at the restaurant, no one pointed defendant out to her, but she recognized him as the same man who had attacked her on 23 August. Mrs. Trogdon again contacted Detective Buheller.

At the conclusion of the *voir dire* hearing, the trial judge found facts consistent with those recited above. He concluded that the in-court identification of the prosecuting witness was completely independent of the photograph shown to her and was

State v. Brady

not influenced in any way by the actions of the State or its officers.

When the trial judge makes findings of fact to determine the admissibility of an in-court identification, the facts when supported by competent evidence are conclusive on appellate courts. *State v. Tuggle*, 284 N.C. 515, 201 S.E. 2d 884 (1974). Here, the evidence supports the court's findings that the witness had an adequate opportunity to observe her assailant and that the in-court identification was of independent origin and based on such observation. These findings are therefore conclusively binding on this Court.

[5] Defendant also contends under this assignment of error that the trial judge made no findings on *voir dire* concerning the admissibility of identification testimony relating to the crimes alleged to have occurred on 23 November 1978. However, defendant failed to object when this testimony was offered. A defendant cannot challenge an in-court identification without at least a timely general objection. *State v. Cook*, 280 N.C. 642, 187 S.E. 2d 104 (1972); *State v. Blackwell*, 276 N.C. 714, 174 S.E. 2d 534, *cert. denied*, 400 U.S. 946 (1970). When an objection is not timely made, it is waived. *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978).

This assignment of error is without merit.

[6] Defendant next contends that the trial judge erred in allowing the State over defendant's objections to introduce the State's *voir dire* Exhibits 1 and 2, two photographs of defendant, for the purpose of illustrating the testimony of the prosecuting witness. He argues that the photographs were used not to illustrate her testimony but rather for purposes of identification, and that they were not properly authenticated because the source of the photographs was not shown.

Mrs. Trogdon described the man depicted in Exhibit 1, stated that it was a fair and accurate representation of her assailant on 23 August 1978 and identified him as defendant. She identified the tattoo of a skeleton shown in Exhibit 2 as a fair and accurate representation of the one she saw on her assailant that same day. The State offered the photographs into evidence in order to il-

lustrate the testimony of the witness, and the trial judge admitted them with the proper limiting instruction.

It is well settled that a witness may use a photograph to illustrate his testimony and make it more intelligible to the court and jury. *State v. Young*, 291 N.C. 562, 231 S.E. 2d 577 (1977); 1 Stansbury's North Carolina Evidence § 34 (Brandis rev. 1973). If a photograph is relevant and material, it will not be excluded merely because it was not made contemporaneously with the occurrence of the events at issue. *State v. Hatcher*, 277 N.C. 380, 177 S.E. 2d 892 (1970); *State v. Lentz*, 270 N.C. 122, 153 S.E. 2d 864, *cert. denied*, 389 U.S. 866 (1967). Here, the photographs were taken in Detective Bulla's office upon defendant's arrest on 7 December 1978. The photographs were properly authenticated and were material and relevant to illustrate the witness's identification of defendant.

We therefore hold that the photographs were properly admitted for illustrative purposes.

We do not consider assignments of error numbers 6, 7, 8, 10, 12, 13, 14, 15, 16 and 19 because defendant has abandoned these assignments on appeal to this Court. N.C. Rules of Appellate Procedure, Rule 28(a).

[7] By assignment of error number 9, defendant contends that the trial court erred in denying his motions for dismissal on the charge of first-degree rape on 23 November 1978. Defendant argues that the State presented insufficient evidence that the victim's resistance was overcome or her submission procured by the use of a deadly weapon.

Defendant was tried and convicted for first-degree rape under G.S. 14-21(1)(b) (Cum. Supp. 1977) (repealed 1979, effective 1 January 1980) which provided as follows:

> If the person guilty of rape is more than 16 years of age, and the rape victim had her resistance overcome or her submission procured by the use of a deadly weapon, or by the infliction of serious bodily injury to her, the punishment shall be death.

In *State v. Thompson*, 290 N.C. 431, 226 S.E. 2d 487 (1976), this Court held that:

. . . a deadly weapon is used to procure the subjugation or submission of a rape victim within the meaning of [G.S. 14-21(1)(b)] when (1) it is exhibited to her and the defendant verbally, by brandishment or otherwise, threatens to use it; (2) the victim knows, or reasonably believes, that the weapon remains in the possession of her attacker or readily accessible to him; and (3) she submits or terminates her resistance because of her fear that if she does not he will kill or injure her with the weapon. In other words, the deadly weapon is used, not only when the attacker overcomes the rape victim's resistance or obtains her submission by its actual functional use as a weapon, but also by his threatened use of it when the victim knows, or reasonably believes, that the weapon is readily accessible to her attacker or that he commands its immediate use.

*Id.* at 444, 226 S.E. 2d at 494-95; *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977); *accord, State v. Dull*, 289 N.C. 55, 220 S.E. 2d 344 (1975), *death sentence vacated*, 428 U.S. 904 (1976).

An examination of the State's evidence in the case *sub judice*, considered in the light most favorable to the State and giving the State the benefit of every reasonable inference to be drawn therefrom, *State v. Strickland*, 290 N.C. 169, 225 S.E. 2d 531 (1976), shows that this case is clearly within the principles enunciated in *State v. Thompson, supra.* Here, Mrs. Trogdon testified that defendant had a hunting knife with him when he was in her bedroom and when he actually raped her there. He told her that if she would do what he wanted to do, he would not hurt her. This evidence is sufficient to permit a reasonable inference that Mrs. Trogdon's submission was procured by the use of a deadly weapon. *See also State v. Carson*, 296 N.C. 31, 249 S.E. 2d 417 (1978); *State v. Lowe*, 295 N.C. 596, 247 S.E. 2d 878 (1978).

Defendant's motions for dismissal were therefore properly denied.

[8, 9] Defendant contends that in two instances the trial judge expressed an opinion regarding the credibility of defense witness John Buheller in violation of G.S. 15A-1222. During the direct examination of Detective Buheller, the trial court ordered certain testimony stricken from the record as inadmissible. The witness

stated that in September 1978 he had told Mrs. Trogdon that in his opinion there was insufficient evidence to proceed with a warrant at that time. Later in the trial, the judge stated to the witness:

> No, sir. Mr. Buheller, you are not excused from this Court. I'm sorry, but that is a clear violation of the Court's order. It has nothing to do — it doesn't express any opinion concerning his testimony. It only concerns him, himself. I will remind him of the order of the Court. All right.

G.S. 15A-1222 provides that "[t]he judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." It imposes on the trial judge, as did its predecessor G.S. 1-180, the duty of absolute impartiality. *State v. Frazier*, 278 N.C. 458, 180 S.E. 2d 128 (1971); *Nowell v. Neal*, 249 N.C. 516, 107 S.E. 2d 107 (1959). This Court has repeatedly held that:

> The Judge should be the embodiment of even and exact justice. He should at all times be on the alert, lest, in an unguarded moment, something be incautiously said or done to shake the wavering balance which, as a minister of justice, he is supposed, figuratively speaking, to hold in his hands. Every suitor is entitled by the law to have his cause considered with the "cold neutrality of the impartial judge" and the equally unbiased mind of a properly instructed jury. This right can neither be denied nor abridged.

*Withers v. Lane*, 144 N.C. 184, 191-92, 56 S.E. 855, 857-58 (1907); *State v. Frazier, supra; State v. McBryde*, 270 N.C. 776, 155 S.E. 2d 266 (1967).

On the other hand, it does not necessarily follow that every ill-advised comment by the trial judge which may tend to impeach the witness is so harmful as to constitute reversible error. The comment should be considered in light of all the facts and attendant circumstances disclosed by the record, "and unless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless." *State v. Perry*, 231 N.C. 467, 471, 57 S.E. 2d 774, 777 (1950).

In the case *sub judice*, it is abundantly clear that the trial judge's comments were not so prejudicial as to have had any effect on the result of the trial. The judge properly ordered that the witness's opinion should be stricken from the record, since he was testifying on a question of law. *See* 1 Stansbury's North Carolina Evidence § 130 (Brandis rev. 1973). As for the judge's later warning to the witness, these comments, in light of the circumstances and the judge's own corrective statements both at that time and later in his charge to the jury, were not so prejudicial as to warrant a new trial.

[10] Defendant next assigns as error the trial court's charge on first-degree burglary. He contends that the judge failed to instruct the jury that the house must have been actually occupied at the time of the commission of the crime, as required by G.S. 14-51.

In a portion of his charge discussing the essential elements of the crime seriatim, the trial judge inadvertently omitted the seventh requirement that the house be occupied at the time of the breaking and entering. However, immediately before and after the section complained of, he included this element in both his initial definition of the crime and in his final charge:

> Now, in Case No. 11104, the defendant has been accused of burglary in the first degree. I charge you that burglary in the first degree is breaking and entering *the occupied dwelling house* of another without her consent in the nighttime with the intent to commit a felony, in this case, rape. I charge that for you to find the defendant guilty of burglary in the first degree, the State must prove seven things each beyond a reasonable doubt.

> *     *     *

> So I charge that if you find from the evidence beyond a reasonable doubt that on or about the 23rd day of November, 1978, Thomas Brady, the defendant, broke a glass in the back door or the dwelling house of Mr. & Ms. Trogdon — well, Deborah Trogdon in this case without her consent in the nighttime intending at that time to commit rape, *and that Deborah Trogdon was in the house when the defendant broke in and entered,* it would be your duty to return a ver-

dict of guilty of burglary in the first degree. [Emphasis added.]

It is well settled that a charge must be construed as a whole in the same connected way in which it was given. If it fairly and correctly presents the law, it will afford no ground for reversing the judgment even if an isolated expression should be found technically inaccurate. *State v. Tomblin*, 276 N.C. 273, 171 S.E. 2d 901 (1970); *State v. Valley*, 187 N.C. 571, 122 S.E. 373 (1924). Here, it is quite clear that, considering the whole charge, the jurors were not misled by the portion of the charge to which defendant excepts. The error in the charge was cured by the trial judge, and thus this assignment of error is without merit.

[11] Defendant contends that the trial judge erred in instructing the jury on the offense of kidnapping.

As amended in 1975, G.S. 14-39 provides in pertinent part:

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

    (1) Holding such other person for ransom or as a hostage or using such other person as a shield; or

    (2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; or

    (3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person.

(b) Any person convicted of kidnapping shall be guilty of a felony and shall be punished by imprisonment for not less than 25 years nor more than life. If the person kidnapped, as defined in subsection (a), was released by the defendant in a safe place and had not been sexually assaulted or seriously injured, the person so convicted shall be punished by imprisonment for not more than 25 years, or by a fine of not

more than ten thousand dollars ($10,000), or both, in the discretion of the court.

G.S. 14-39(a) defines the offense of kidnapping. Proof of the elements set forth therein is all that the statute requires for a *conviction* of kidnapping.

G.S. 14-39(b) merely prescribes the punishment for one convicted of kidnapping. It does not affect the elements of the offense of kidnapping or create a separate offense. Ordinarily it is the province of the jury to determine whether the defendant has committed the offense of kidnapping as defined in G.S. 14-39(a). Since the factors set forth in subsection (b) relate to sentencing, it is for the trial judge to determine their existence or nonexistence from the evidence presented at trial, at a sentencing hearing pursuant to G.S. 15A-1334 or at both proceedings. *State v. Williams,* 295 N.C. 655, 249 S.E. 2d 709 (1978).

Here, the trial judge in his charge to the jury erroneously included the mitigating circumstances relating to punishment as set forth in G.S. 14-39(b). These factors do not constitute an essential element of the offense of kidnapping. Thus, their inclusion in the charge obviously placed an added burden upon the State and was therefore favorable to defendant. This assignment of error is overruled.

[12] Finally defendant contends that the trial judge erred in imposing life sentences for the crimes of rape and burglary which occurred on 23 November 1978. He argues that judgment should have been arrested in the rape conviction, since the crime of rape was the underlying felony and an essential element of the crime of burglary.

Defendant relies on the constitutional guaranty against double jeopardy which protects him from multiple punishments for the same offense. In *State v. Overman,* 269 N.C. 453, 153 S.E. 2d 44 (1967), this Court stated:

> If each of two criminal offenses, as a matter of law, requires proof of some fact, proof of which fact is not required for conviction of the other offense, the two offenses are not the same and a former jeopardy with reference to the one does not bar a subsequent prosecution for the conviction for the other.

*Id.* at 465, 153 S.E. 2d at 54; *State v. Birckhead,* 256 N.C. 494, 124 S.E. 2d 838 (1962).

The offense of burglary is completed by the breaking and entering of the occupied dwelling of another, in the nighttime, with the intent to commit the designated felony therein. The crime has been committed even though, after entering the house, the accused abandons his intent to commit the designated felony. *State v. Wells,* 290 N.C. 485, 226 S.E. 2d 325 (1976); *State v. McDaniel,* 60 N.C. (Win.) 245 (1864). Consequently, the felonious intent required as an element of burglary cannot be equated with the commission of the underlying felony. If a burglar after breaking and entering proceeds to commit the underlying felony inside the dwelling, he can be convicted of both crimes. *See State v. Dammons,* 293 N.C. 263, 237 S.E. 2d 834 (1977); *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974), *death sentence vacated,* 428 U.S. 902 (1976); *State v. Smith,* 266 N.C. 747, 147 S.E. 2d 165 (1966) (per curiam). Here, the State was not required to prove the charge of rape in order to convict defendant of burglary. It was only necessary to prove that the purpose of the breaking and entering was to commit the designated crime of rape. When he proceeded to rape the victim after committing the burglary, he then had committed two separate and distinct crimes.

This assignment of error is without merit.

We have carefully considered the entire record and find no error warranting a new trial.

No error.